IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| ABBY TISCARENO and GUILLERMO TISCARENO,<br><br>      Plaintiffs,<br><br><br><br><br><br><br><br><br><br>          vs.<br><br><br>LORI FRASIER,  WILLIAM BEERMAN, RICHARD ANDERSON, DAVID BRICKEY, MARION WALKER, INTERMOUNTAIN HEALTH CARE, et al.,<br><br>      Defendants. | MEMORANDUM DECISION AND ORDER GRANTING MOTIONS TO DISMISS FILED BY DEFENDANTS BEERMAN, IHC, AND BRICKEY, AND DENYING WITHOUT PREJUDICE ANDERSON'S MOTION TO DISMISS; AND GRANTING LEAVE TO AMEND<br><br><br><br><br>Case No. 2:07-CR-336 TS |

I.  INTRODUCTION

Plaintiff Abby Tiscareno (Ms. Tiscareno) brings this action under § 1983[1] and the

Utah Constitution alleging the six named Defendants violated her due process rights

_____

[1]42 U.S.C. § 1983.

because they failed to produce exculpatory evidence that would have proven her innocence in her first criminal trial.  That evidence was eventually discovered, presented at her second criminal trial, and she was acquitted.

Four of the Defendants,[2] Intermountain Health Care (IHC), Beerman, Brickey, and Anderson move to dismiss under Fed. R. Civ. P. 12(b)(6) on the ground the Complaint fails to state a claim for which relief can be granted.  The Court grants IHC's, Beerman's, and Brickey's Motions to Dismiss.  The Court denies Anderson's Motion to Dismiss, without prejudice to its renewal after the time for leave to amend.  Finally, the Court grants Plaintiff leave to amend her complaint regarding DCFS, Anderson, and the production of potentially exculpating documents.

## II.  FACTS AS STATED IN THE COMPLAINT

The following facts are taken from Plaintiff's Complaint.  Ms. Tiscareno operated a state licensed daycare center in her home.  On the morning of November 14, 2003, a parent dropped off his sons, N.M., age 1, and his brother, J.M., age 2, at Ms. Tiscareno's home daycare.  After attempting to feed N.M. a bottle, Ms. Tiscareno observed that N.M. was experiencing severe difficulty breathing and appeared to lose consciousness.  After trying to revive N.M., Ms. Tiscareno called 911.  N.M. was transported to Primary Children's Medical Center (PCMC).

Upon admission to PCMC, N.M. underwent a CT head scan.  The Report of the CT scan concluded, in part: "Impression: probable acute subdural hemorrhage superimposed

---

[2]Defendant Walker subsequently filed a Motion for Judgment on the Pleadings.

on chronic subdural hemorrhage."  The CT scan also revealed pressure on the brain and N.M. was immediately taken to surgery.  Defendant Dr. Marion Walker performed the surgery and removed a subdural hematoma, or clot, from N.M.'s head.

Dr. Walker was employed at PCMC by the University of Utah, a division of the State of Utah.   Dr. Walker sent a portion of the clot to the Pathology Department to be tested. Dr. Walker did not document sending the clot to pathology in his operative note, nor did he discuss the result of the pathology examination in any subsequent progress note concerning N.M.

The head of PCMC's pathology department prepared a pathology report of the tested clot.  That report revealed there was evidence of prior bleeding.  A letter by one Dr. Townsend (Townsend letter) was attached to the pathology report, stating that she had reviewed the result with another physician, who also concurred that the pathology examination showed a "prior bleed" in the brain.  The pathology report and the Townsend letter were sent to the Center for Safe and Healthy Families (the Center) at PCMC on November 17, 2003.

Defendant Dr. Lori Frasier is employed by the University of Utah as the Medical Director of the Assessments Team of the Center at PCMC.   The Center is jointly administered by the University of Utah and IHC and receives funding from IHC, the State of Utah, and the federal government.  The Center interacts with various state agencies in the investigation, screening, and charging of child abuse.

Dr. Frasier was one of the primary doctors involved in the case.  Based on N.M.'s CT scan and an interview with the father, Dr. Frasier became suspicious that N.M. had

3

suffered an abusive head injury and contacted the Utah Division of Child and Family Services (DCFS) and law enforcement.  Dr. Frasier concluded that N.M.'s injury occurred earlier that day while N.M. was in Ms. Tiscareno's care.

During the police investigation, Dr. Frasier informed the detectives assigned to the case that N.M.'s injury could only have occurred during the time N.M. was in Ms. Tiscareno's care.   Dr. Frasier then provided a three-page report containing these conclusions. The police arrested Ms. Tiscareno on November 19, 2003.

Based on Dr. Frasier's statements to the Detectives, and on her report, Defendant David Brickey (Brickey), the Summit County Chief Prosecutor, charged Ms. Tiscareno with Second Degree Felony Child Abuse on November 20, 2003

The same day she was charged, Ms. Tiscareno's first attorney formally requested that the prosecution produce copies of the information, police reports, and any other evidence in the criminal case against Ms. Tiscareno.  Brickey sent Ms. Tiscareno's attorney a letter dated December 1, 2003, stating that as soon as additional discovery such as medical reports and investigative reports were forthcoming, copies would be forwarded to the defense.   Thereafter, Brickey provided the defense with the medical records he received.

Between November 14, 2003, and May 26, 2005, Dr. Frasier, the Medical Director, received or reviewed one or more subpoenas and/or requests from Brickey to produce medical records of N.M. for use as evidence in the case against Ms. Tiscareno.  The Center at PCMC had a copy of the pathology report concerning the blood clot at the time

Dr. Frasier responded to the subpoenas and/or requests for medical requests concerning N.M. issued by Brickey.

On or after November 17, 2004, Dr. Walker, the surgeon who had removed the blood clot, received copies of the Pathology Report concerning the blood clot taken from N.M.'s brain.  Between November 14, 2003, and May 26, 2005, Dr. Walker received subpoenas and/or requests from Brickey to produce medical records of N.M.

 Neither Dr. Frasier nor Dr. Walker produced the pathology slides, report, or the Townsend letter to  Brickey. During the relevant time, the pathology slides, report, and the Townsend letter were part of N.M.'s medical records at PCMC.

Defendant Beerman was the Director of Patient Administration at PCMC.  PCMC is owned and operated by IHC.  It receives federal and state funds.  As Director, Beerman had a duty to manage and supervise production of medical records lawfully requested from PCMC in connection with the prosecution of criminal cases.

Mr. Beerman and IHC received one or more subpoenas to produce complete medical records of N.M.  As Director, Beerman had control of the pathology slides, the pathology report, and the Townsend letter.  Defendant Beerman and IHC received one or more subpoenas to produce complete medical records of N.M.  Beerman and IHC did not produce the pathology slides, report, or the Townsend letter to Defendant Brickey.

Defendant Ricard Anderson was the Director of DCFS.  DCFS maintained an office at PCMC during the relevant time.  Mr. Anderson received one or more subpoenas and/or

requests from  Brickey.  Mr. Anderson did not produce the pathology slides, report, or the Townsend letter to  Brickey.[3]

Neither Dr. Frasier nor Dr. Walker informed  Brickey or other members of the prosecution team of: (1) the fact that Dr. Walker had sent a small portion of the clot he removed to the Pathology Department for examination, (2) the pathology slides, (3) the pathology report, or (4) the Townsend letter.  Prior to Ms. Tiscareno's first trial, her attorney was not aware or furnished with the above medical records or facts.

The prosecution's case at the first trial was supported by testimony from Dr. Frasier and Dr. Walker that N.M.'s injury was "fresh."  One piece of medical evidence that was potentially inconsistent with the prosecution's theory that Ms. Tiscareno was the only one who could have injured N.M. was the CT scan taken of N.M.'s brain at PCMC shortly after his admission.  According to the radiologists, the scan involved two densities of blood, suggesting old bleeding and fresh bleeding.

During Ms. Tiscareno's first trial in October 2004, Dr. Walker testified that a sample of the tissue removed from N.M.'s head during surgery was sent to pathology for examination.  Dr. Walker testified that his recollection of the result of the examination was that the pathology report showed a bland clot and that there was nothing spectacular about it.  Dr. Walker's trial testimony about the pathology examination was the first time he had mentioned the fact of the pathology examination of the blood clot in the presence of the prosecution team.  The jury convicted Ms. Tiscareno of child abuse in the first trial.

---

[3]Significantly, the Complaint does not allege that either DCFS or Mr. Anderson actually had the pathology slides, report, or the Townsend letter.

Subsequently, Ms. Tiscareno hired a new attorney who subpoenaed PCMC for the Pathology Report.  Ms. Tiscareno also petitioned for a new trial, which was granted on the grounds of improper jury instructions.

During the second trial, Dr. Frasier admitted that she was aware that the result of the Pathology Examination indicated prior bleeding in N.M.'s brain and admitted that in the first trial the jury had been given inaccurate information about whether there was a prior bleed in N.M.'s brain.  Dr. Frasier testified that she had consulted with Dr. Walker regarding N.M. and that he did not tell her about the Pathology Report.

At the end of the second trial, the jury found Ms. Tiscareno not guilty.

## III. STANDARD OF REVIEW

When considering a motion to dismiss under Fed. R. Civ. P. Rule 12(b)(6), a court must determine whether the facts alleged in the complaint, if true, would entitle the plaintiff to recovery.  "The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted."[4]  "All well-pleaded facts, as distinguished from conclusory allegations, are accepted as true and viewed in the light most favorable to the nonmoving party."[5]  The court must "determine whether a complaint has set forth factual allegations sufficient to 'raise a right to relief

---

[4]*Sunrise Valley, LLC v. Kempthorne*, 528 F.3d 1251 (10th Cir. 2008) (quoting *Sutton v. Utah State Sch. for the Deaf & Blind*, 173 F.3d 1226, 1236 (10th Cir. 1999)).

[5]*Teigen v. Renfrow,* 511 F.3d 1072, 1078 (10th Cir. 2007).

above the speculative level.'"[6]  "In so doing," the court looks "to the specific allegations in the complaint to determine whether they plausibly support a legal claim for relief."[7]

### IV.  DISCUSSION AND CONCLUSIONS

### A.  Injunction Claims

Plaintiff's Sixth Cause of Action seeks to enjoin Anderson to order DCFS to conduct independent investigations of allegations of child abuse where physicians employed at PCMC are the complaining witness.[8]  Plaintiff acknowledges that this claim should be dismissed.  The same reason for the concession of the Sixth Cause of Action applies equally to her Fifth Cause of Action, to enjoin IHC to require it adopt and implement official policies and procedures to assure that complete medical records of alleged child abuse victims will be produced as discovery in criminal prosecutions.   As conceded by Plaintiff, past exposure to alleged "illegal conduct does not itself show a present case or controversy because it does not show a present case or controversy regarding injunctive relief, . . . if unaccompanied by any continuing, present adverse effects."[9]  Accordingly, the Fifth and Sixth Causes of Action will be dismissed.

---

[6]*Pace v. Swerdlow*, 519 F.3d 1067, 1075 (10th Cir. 2008) (quoting *Bell Atlantic Corp. v. Twombly*, 127 S.Ct. 1955, 1965 (2007)).

[7]*Id*. (quoting *Alvarado v. KOB-TV, LLC*, 493 F.3d 1210, 1215 n. 2 (10th Cir. 2007)).

[8]Docket No. 31 at 21-22.

[9]*Id*. (quoting *O'Shea v. Littleton*, 414 U.S. 488, 495-96 (1974)).

B.  IHC and Beerman

Plaintiff asserts that IHC and Beerman violated her due process rights under the Fourth and Fourteenth Amendment of the United States constitution as well as under Article 1, Section 7, of the Utah constitution by failing to identify, disclose and provide materially exculpatory evidence to the County Prosecutor.[10] Plaintiff contends that IHC and Beerman, acted in concert with the State of Utah and other state actors, including Dr. Frasier and the Center, and thus they had an obligation under *Brady v. Maryland*,[11] to disclose to the County Prosecutor during the investigation the exculpatory medical records created and kept at IHC's PCMC.

IHC and Beerman move to dismiss asserting absolute witness immunity and also contending that they are not state actors and, therefore, are not liable under §1983 or for a violation of the Utah Constitution.  The Court will address the state actor issue first.

To state a claim for relief in an action brought under § 1983, plaintiffs "must establish that they were deprived of a right secured by the Constitution or laws of the United States, and that the alleged deprivation was committed under color of state law."[12] The "under-color-of-state-law element of § 1983 excludes from its reach 'merely private conduct, no matter how discriminatory or wrongful.'"[13]

---

[10]Complaint §IX (Third Cause of Action alleging violation of due process under the Utah Constitution).

[11]373 U.S. 83 (1963).

[12]*Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49-50 (1999).

[13]*Id*. at 50 (quoting  *Blum* v. *Yaretsky*, 457 U.S. 991, 1002 (1982)).

IHC and Beerman are not state employees. However, private individuals and entities may be deemed state actors for purposes of establishing § 1983 liability, "if they have 'acted together with or have obtained significant aid from state officials or if their conduct is otherwise chargeable to the state.'"[14]  In *Johnson v. Rodrigues*,[15] the Tenth Circuit examined the "four tests. . . to determine whether private parties should be deemed state actors when conducting a state action analysis: (1) the public function test, (2) the nexus test, (3) the symbiotic relationship test, and (4) the joint action test."[16]

      1.    Public Function Test

The public function test "consists of determining whether the state has delegated to a private party 'a function traditionally exclusively reserved to the states.'"[17] The complaint does not allege that IHC or Beerman "performed a service which was traditionally the exclusive prerogative of the state."[18]  Accordingly, there is no showing of state action under the public function test.

      2.    Nexus Test

Under the nexus test, the Plaintiff "must demonstrate that 'there is a sufficiently close nexus between the government and the challenged conduct such that the conduct

---

[14]*Johnson v. Rodrigues*, 293 F.3d 1196, 1202 (10th Cir. 2002) (quoting *Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922, 937 (1982)).

[15]*Id.*

[16]*Id.*

[17]*Id.* at 1203 (quoting *Gallagher v. Neil Young Freedom Concert*, 49 F.3d 1442, 1447 (10th Cir. 1995)).

[18]*Id.*

may be fairly treated as that of the State itself.'"[19]   Under this approach, the state must have "exercised coercive power or [have] provided such significant encouragement, either overt or covert."[20]   The Complaint does not allege that the State directly or indirectly coerced or encouraged IHC or Beerman to withhold any documents.  Thus, there is no showing of a nexus between IHC or Beerman and the state of Utah under the nexus test.

### 3.    Symbiotic relationship test

Under the symbiotic relationship test, the state must have "'so far insinuated itself into a position of interdependence' with a private party that 'it must be recognized as a joint participant in the challenged activity.'"[21] However, "extensive state regulation, the receipt of substantial state funds, and the performance of important public functions do not necessarily establish the kind of symbiotic relationship between the government and a private entity that is required for state action."[22]

The Complaint does not allege that the state of Utah has "insinuated itself into a position of long-term interdependence" with either IHC or Beerman.[23]   The Supreme Court uses the concept of "entwinement" in determining whether a private party's action constituted state action under the symbiotic relationship test.[24]   In *Johnson v. Rodrigues*,

---

[19]*Id.* (quoting *Gallagher*, 49 F.3d at 1448) (further quotation omitted).

[20]*Id.*

[21]*Id.* at 1204 (quoting *Gallagher*, 49 F.3d at 1451) (further quotation omitted).

[22]*Id.*

[23]*Id.*

[24]*Id.*

the Tenth Circuit explained that the definition of entwine is "'to twine together, to interweave, attach or involve inextricably in sentiment or thought.'"[25]

In the circumstances alleged in the Complaint, there was no close union between the state of Utah and either IHC or Beerman and no interweaving between Beerman, IHC, and the State. Thus, under the symbiotic relationship test or its related concept, entwinement, IHC and Beerman's alleged conduct did not constitute activity under color of state law.

4.     Joint Action Test

The joint action test applies "if a private party is a 'willful participant in joint action with the State or its agents.'"[26] This test requires the Court to "'examine whether state officials and private parties have acted in concert in effecting a particular deprivation of constitutional rights."[27]   There is concert of action if there is "a substantial degree of cooperative action between state and private officials, or . . . 'overt and significant state participation' in carrying out the deprivation of plaintiff's constitutional rights."[28]

Plaintiff contends that because she alleges that Beerman and IHC are custodians and guardians of the medical records and are the "employers of" Frasier and Walker,[29] it

---

[25]*Id*. at 1205 (quoting Webster's Third New Int'l Dictionary of the English Language, unabridged (1968)).

[26]*Id.* (quoting *Gallagher*, 49 F.3d at 1453).

[27]*Id.*

[28]*Id.*

[29]Docket No. 46 (Pl.s' Supp. Reply, at 6).

is plausible that Beerman and IHC acted either independently, or "in concert with their employees,"[30] Frasier and/or Walker, in failing to disclose the exculpatory evidence to the County Prosecutor.

To begin with, if the allegation is that IHC and Beerman acted independently of Frasier and Walker in failing to disclose, there is no showing of joint action sufficient to establish state action.

Further, at this stage the Court looks only to the allegations in the Complaint. Thus, it is important to distinguish between Plaintiff's arguments and her actual allegations. Contrary to Plaintiff's position, her Complaint does not allege that "*IHC* employed Defendants Frasier and Walker at PCMC."[31] Instead the Complaint alleges that it was the *University of Utah,* "a division of the State of Utah, that employed Defendant Frasier during the relevant time"[32] and that she was employed "at" the Center at PCMC.[33] It also alleges she was acting in the course and scope of her employment when she participated in the Tiscareno case, and conducted child abuse and neglect assessments.[34] Similarly, the Complaint alleges that it was the *University of Utah* that "employed Defendant Walker as a physician and neurosurgeon at PCMC."[35] It also alleges Dr. Walker was acting "within

---

[30]*Id*. at 7.

[31]*Id*. at 6 (emphasis added).

[32]Compl, ¶ 5.

[33]*Id*. ¶ 6 (emphasis added).

[34]*Id*. ¶¶ 11, 12.

[35]*Id*. ¶ 16.

the course and scope of his employment *by the U of U*" when he treated N.M., in providing advice to the County Prosecutor regarding the Tiscareno Case, in participating in the child abuse assessment at PCMC, and in testifying in criminal child abuse prosecution as a witness for the state.[36]  The Complaint alleges in a conclusory manner that in participating in the case, Frasier and Walker acted pursuant to the unspecified customs, policies, practices, rules, and regulations of IHC, the U of U, and DCFS.   Equally conclusory and nonspecific is the allegation Plaintiff chiefly relies on to establish concerted activity sufficient to show IHC and Beerman acted under color of state law:

> In doing or failing to do the acts complained of [failing to produce the exculpatory records] Defendants and each of them acted jointly, acted in concert with the State of Utah and acted under color of and pursuant to the customs, practices, policies, rules, and regulations and/or laws of the State of Utah.[37]

"Factual allegations must be enough to raise a right to relief above the speculative level."[38]  All but two of the nonconclusory allegations Plaintiff relies upon to show concerted activity for IHC and Beerman involve only Walker and Frasier.[39]   The acts of these University of Utah employees are not, however, linked to IHC or to Beerman by anything but the facts that they worked for the University at PCMC and the two conclusory allegations quoted above.  The factual allegations that do involve IHC and Beerman—that they had custody and control of records and did not disclose them in response to the

---

[36]*Id*. ¶ 17, 18, 19.

[37]*Id.* ¶ 47.

[38]*Twombly*, 127 S.Ct. at 1965

[39]Docket No. 46 (Pl.s' Supp. Reply 5-6).

subpoena—do not show "a substantial degree of cooperative action between state and private officials, or . . . 'overt and significant state participation' in carrying out the deprivation of plaintiff's constitutional rights."[40]  What is missing are facts alleging joint action[41] between either Beerman and IHC on the one hand and Walker and/or Frasier on the other, in failing to disclose the records.

Furthermore, the Complaint points out that the Frasier and Walker did not inform the prosecution or members of its team of the pathology report, slides, or the attached letter.   If the prosecution team was kept in the dark about the exculpatory documents,[42] then  those state actors could not have acted in concert with IHC or Beerman in concealing the information.

5.    Failure to State a Claim Against Beerman and IHC

Accepting Plaintiff's allegations as true, those allegations are insufficient to treat IHC and Beerman as state actors as required by § 1983 under any of the four tests.  Therefore, the Complaint fails to state a ¶ 1983 claim against IHC and Beerman.

---

[40]*Johnson*, 293 F.3d at 1205.

[41]*See Anderson v. Suiters*, 499 F.3d 1228, 1234 (10th Cir 2007) (finding plaintiff failed to state a claim for relief under § 1983 against media defendants because allegations of their involvement were insufficient to treat them as state actors where "what was missing were facts alleging joint action between police officer and media defendants in act that allegedly violated her rights.").

[42]*See* Plaintiff's Compl. ¶¶154-55, 158, 174, 176-77, 179, 224-226, 241.

For the same reasons, Plaintiff's allegations fail to state a claim against IHC and Beerman for denial of due process under Article 1, Section 7, of the Utah Constitution, which prohibits certain government conduct.[43]

Because the Complaint does not state a claim that IHC and Beerman acted in concert with the state as required for them to be deemed state actors, Plaintiff's claims against them are dismissed.   Accordingly, the Court need not address IHC's and Beerman's assertion of witness immunity.

    C.      Brickey's Motion to Dismiss

        1.      § 1983 Claims

Plaintiff argues her claims against  Brickey are two fold.  First, that Brickey had a duty under *Brady* to conduct the investigation in the underlying criminal case such that it would turn up and turn over the exculpatory evidence and failed to do so.[44]  Second, that Brickey had an administrative function and duty under *Brady* to establish adequate policies, procedures, rules and regulations, and to adequately train and supervise members of the prosecution team to assure that they identified and disclosed exculpatory evidence to Brickey for disclosure to Plaintiff's first attorney in the criminal case, but failed to do so. [5]4

---

[43]*See Spackman ex rel. Spackman v. Bd. of Educ*, 2000 UT 87 ¶ 20, 15 P.3d 533 (holding that "a constitutional provision prohibits certain government conduct generally qualifies as a self-executing clause" and finding Utah's due process clause is "inarguably prohibitory").

[44]Docket No. 29 (Pl.'s Opp. Mem. 6).

[45]*Id.*

Plaintiff argues Brickey violated her due process rights by his intentional or reckless performance of his investigative and administrative duties in the first criminal case.

Plaintiff relies on *Kyles v. Whitley*[46] as the source of the duty of a prosecutor such as Brickey "to learn of any favorable evidence known to others acting on the government's behalf, including the police."[47]  *Kyles* dealt with evidence already discovered by the police who "were acting on the government's behalf in the case."[48]  In *Kyles*, the Court noted that the "prosecutor has the means to discharge the government's *Brady* responsibility if he will," by establishing "procedures and regulations" to carry "the prosecutor's burden and to ensure communication of all relevant information on each case to every lawyer who deals with it."[49]  The Court further held the "state's obligation under *Brady*, to disclose evidence favorable to the defense turns on the cumulative effect of all such evidence suppressed by the government and [also held] that the prosecutor remains responsible for gauging that effect regardless of any failure *by the police* to bring favorable evidence to the prosecutor's attention."[50]

---

[46]514 U.S. 419 (1995)

[47]*Id*. at 438.

[48]*Id*.

[49]*Id*. (quoting *Giglio v. United States*, 405 U.S. 150, 154 (1972)).

[50]*Id*. at 421 (emphasis added).  *See also Smith v. Sec'y of New Mexico Dep't of Corr.*, 50 F.3d 801 (10th Cir. 1995) (vacating conviction and holding prosecutors' lack of actual knowledge of items was no defense to *Brady* where items were known to police in another county).

Brickey asserts absolute prosecutorial immunity.  Brickey argues that he was acting in an advocatory role; thus, entitling him to prosecutorial immunity.  He argues that even if the scope of his duty under *Kyles* is as broad as argued by Plaintiff, he is nonetheless immune from liability under § 1983.[51]   In addition, he points out that the Complaint expressly alleges that while Dr. Frasier, Dr. Walker, and the Center at PCMC all had the potentially exculpatory records, all failed to produce them to him or to the prosecution team[52] in response to his subpoenas.

Brickey also asserts that the state constitutional claim fails as a matter of law because Utah courts apply the common law to claims for damages for one who suffers a constitutional tort, and, since under the common law  prosecutors are entitled to absolute immunity, Brickey is immune from suit.   He further argues that he is entitled to immunity under the Utah Governmental Immunity Act,[53] because Plaintiff failed to comply with the Act's notice of claim requirements.

Brickey points out that in the present case, unlike the situation in *Kyles*, the allegations are that the police were not informed the clot was sent to pathology, the pathology report, or the Townsend letter.[54]   Brickey also objects to Plaintiff's position

---

[51] *Kyles* was a collateral attack on a criminal conviction that the Court vacated due to the *Brady* violation.  *Kyles* did not involve a claim under § 1983 for damages or the assertion of prosecutorial immunity from such a damages claim

[52] Compl. ¶¶154-55, 170-193.

[53] Utah Code Ann. § 63-30-10.

[54] *See, e.g.*, Compl. ¶¶ 155-59 (alleging Dr. Frasier did not disclose to detective that she or the Center had received Pathology report or Townsend letter).

seeking to (1) extend the language in *Kyles* from the disclosure of evidence to discovery

of evidence; and (2) seeking to extend the prosecutor's administrative duties under *Kyles*

to those not on the prosecution team.[55]  Finally Brickey argues Plaintiff's failure to train

claim against him is not supported by the allegations contained in the Complaint.[56]

> 2.     Absolute Prosecutorial Immunity

"[A] prosecutor enjoys absolute immunity from § 1983 suits for damages when he

acts within the scope of his prosecutorial duties."[57]  Prosecutors are afforded absolute

immunity because exposing them to § 1983 lawsuits growing out of their official activity

"would divert '[their] energy and attention . . . from the pressing duty of enforcing the

criminal law.'"[58] The Court, however, noted that prosecutorial immunity does not generally

extend to "those aspects of the prosecutor's responsibility that cast him in the role of an

administrator or investigative officer rather than that of advocate."[59]  In addition, "'[a]bsolute

prosecutorial immunity is not defeated by a showing that the prosecutor acted wrongfully

---

[55]Docket No. 29 7-8 (Pl.'s Opp. Mem.).

[56]Compl. ¶ 229 (alleging Brickey violated Plaintiff's rights by failing to identify, disclose and provide exculpatory evidence).

[57]*Imbler v. Pachtman*, 424 U.S. 409, 420, 427 n.27 (1976) (Prosecutor was absolutely immune even for allegedly knowingly using perjured testimony and suppressing exculpatory material at trial.).

[58]*Grant v. Hollenbach*, 870 F.2d 1135, 1139 (6th Cir. 1989) (quoting *Imbler*, 424 U.S. at 425).

[59]*Imbler*, 424 U.S. at 430-431.

or even maliciously, or because the criminal defendant ultimately prevailed on appeal or in a habeas corpus proceeding.'"[60]

"[A]dvocacy is not limited to filing criminal charges or arguing in the courtroom." [1][6] The Tenth Circuit has held that **"**acts undertaken by a prosecutor in preparing for the initiation of judicial proceedings or for trial, and which occur in the course of his role as an advocate for the State, are entitled to the protections of absolute immunity."[62]  "Preparing to initiate a prosecution may necessitate *obtaining*, reviewing and evaluating evidence [and] absolute immunity may attach when these functions are necessary so that a prosecutor may fulfill his function as an officer of the court."[63]

The Supreme Court applies a "functional approach" in determining whether a prosecutor is entitled to absolute immunity.[64]  Under the "functional approach" the court examines "the nature of the functions with which a particular officer or class of officials has been lawfully entrusted, and [the court]. . . evaluate[s] the effect that exposure to particular forms of liability would likely have on the appropriate exercise of those

---

[60]*Grant*, 870 F.2d at 1138 (quoting M. Schwartz & J. Kirklin, *Section 1983 Litigation: Claims, Defenses, and Fees* § 7.8 (1986)).

[61]*Mink v. Suthers*, 482 F.3d 1244, 1261 (10th Cir. 2001).

[62]*Hunt v. Bennett*, 17 F.3d 1263, 1267 (10th.Cir. 1994) (quoting *Buckley v. Fitzsimmons*, 113 S. Ct. 2606, 2615 (1993)).

[63]*Snell v. Tunnell*, 920 F.2d 673, 693 (10th Cir. 1990) (emphasis added).

[64]*Forrester v. White*, 484 U.S. 219, 223 (1988).

functions."[65]  Although the Court in *Forrester* dealt with the issue of judicial immunity, the

Court also commented upon its extension to prosecutors, stating:

> the nature of adjudicative function requires a judge frequently to disappoint
> some of the most intense and ungovernable desires that people can have.
> . . . This is the principal characteristic that adjudication has in common with
> legislation *and with criminal prosecution*, which are the two other areas in
> which absolute immunity has been most generously been provided.[66]

The "'functional analysis' focuses on the role of the prosecutor at the time he engages in

the challenged conduct."[67]

 Quoting *Bragdon v. Malone,*[68] Plaintiff contends her allegations against Brickey are

"much more akin to a misuse of investigative techniques legitimately directed toward the

acquiring of evidence . . . than it is to an exercise [of] a prosecutor's duty to organize,

evaluate, and marshal" evidence during trial.[69]  However, *Bragdon* has no application to

this case.  *Bragdon* dealt with an FBI agent's assertion he was protected by prosecutorial

immunity for withholding exculpatory evidence and fabricated evidence during his

investigation.[70] As stated above, this is not a case in which an investigative officer

discovered exculpatory evidence and failed to disclose it to the prosecutor.  Further, the

language Plaintiff relies upon from *Bragdon* is itself quoted from a Sixth Circuit case,

---

[65]*Id.*

[66]*Id.* at 226 (emphasis added). S*ee also Grant*, 870 F.2d at 1137.

[67]*Grant*, 870 F.2d at 1138.

[68]425 F. Supp. 2d 1, 3-5 (D. D.C. 2006).

[69]Pl.'s Opp. Mem. 13 (quoting *Bragdon*,425 F. Supp. 2d at 6.

[70]*Id.* at 4.

*Barbera v. Smith*,[71] which was distinguishing the level of immunity afforded to the two aspects of "pre-litigation functions"[72] performed by prosecutors. In the present case, there are no allegations of any act, or failure to act, by Brickey prior to his decision to charge Plaintiff by the Information. Therefore, the discussion in *Barbera*, quoted in *Bragdon*, is not helpful to this case.

Focusing on the Plaintiff's argument that her claims against Brickey are based on "non-prosecutorial functions undertaken in connection" with her case, "including administrative and investigative functions"[73] the Complaint does not allege any specific administrative and investigative functions. As Prosecutor Brickey points out, it is hard to determine how and what way Brickey in his administrative and investigative function is supposed to have violated the Plaintiff's due process rights.[74] As discussed in *Burns v. Reed*,[75] when considering a claim of prosecutorial immunity, "it is important to determine the precise claim that [plaintiff] has made against" the defendant regarding the alleged violation.[76] Plaintiff does not allege anywhere in her Complaint that Brickey engaged in his administrative and investigative functions prior to his filing the charge against the

---

[71]836 F.2d 96, 100 (6th Cir. 1987).

[72]*Id.*

[73]Compl. ¶ 43.

[74]Docket No. 34 at 3.

[75]500 U.S. 478 (1991).

[76]*Id.* at 487-88.

Plaintiff.[77]   The Court need not accept "'unwarranted inferences drawn from facts or footless conclusions of law predicated upon them.'"[78]

Examining the precise claims that Plaintiff does make, the Complaint alleges Brickey violated *Brady* in connection with: (1) his decision to charge Plaintiff with Second Degree Felony Child Abuse based on Frasier's statements to the detectives and her report;[79] (2) his subsequent issuance of subpoenas to the named defendants requesting N.M.'s medical records and providing all information received from subpoenas to Plaintiff's counsel;[80] and (3) meeting with Defendant Frasier, and members of the prosecution team to prepare for the Preliminary Hearing in the Plaintiff's case.[81]   However each of these functions as alleged are advocacy functions, not administrative or investigatory functions.

First, Brickey cannot be held liable for charging the Plaintiff in the criminal action because "initiating a prosecution and in presenting the State's case, the prosecutor is immune from a civil suit for damages under § 1983."[82] "Deciding whether to bring charges—which necessarily includes an evaluation of whether there has been sufficient

---

[77]*See* Compl. ¶ ¶ 43, 162, 296-305.

[78]*Bryson v. City of Edmond*, 905 F.2d 1386, 1390 (10th Cir. 1990) (quoting *Ryan v. Scoggin*, 245 F.2d 54, 57 (10th Cir. 1957)).

[79]Compl. ¶ 152 (also alleging Brickey charged Plaintiff with second degree felony child abuse by Information on November 20, 2003).

[80]*Id.* ¶ 170, 176, 184, 185, 194 (alleging actions in connection with subpoenas Brickey issued between November 14, 2003 and May 26, 2005).

[81]*Id.* ¶ 200.

[82]*Imbler*, 424 U.S. at 431.

investigation to support charges—is a quintessential prosecutorial function protected by absolute immunity."[83]

Second, Brickey is entitled to absolute immunity for issuing subpoenas requesting medical records to the named defendants because "a prosecutor enjoys absolute immunity from § 1983 suits for damages when he acts within the scope of his prosecutorial duties." [84] Issuing a subpoena for "medical records . . . would fall under the rubic of the traditional prosecutorial functions of marshalling the evidence, . . . and advocating on behalf of [the State]."[85]  Plaintiff argues that Brickey had a duty under *Brady* to conduct the investigation in the underlying criminal case such that it would turn up and turn over the exculpatory evidence and failed to do so.  However, this case does not involve any allegations of pre-litigation conduct wherein the prosecutor gave advice to the police,[86]  directed the police's pre-charge investigation, or allowed his staff to participate in the arrest.[87]  If Brickey is held

---

[83]*Stein v. Disciplinary Bd. of Supreme Court of NM*, 520 F.3d 1183, 1194 (10th Cir. 2008) (citing *Buckley*, 509 U.S. at 273 for rule that "prosecutorial immunity extends to the prosecutor's evaluation of evidence assembled by investigators" and affording prosecutorial immunity to state bar official "charged with duties of investigating, drawing up, and presenting cases involving attorney discipline").

[84]*Id.* at 420.

[85]*Thomas v. County of Putnam*, 262 F. Supp. 2d 241, 249 (S.D. N.Y. 2003).

[86]*Burns*, 500 U.S. at 482, 496 (declining to extend absolute immunity to prosecutorial function of giving legal advise to the police).

[87]Plaintiff cites *Miller v. County of Allegheny*, 2006 WL 1330194 (W. D. Pa. 2006), an unpublished case.  In *Miller*, two persons from the prosecutor's staff participated in a Defendant's arrest. *Id.* at * 1-2. The court found the prosecutor was not immune from claim of failure to train or supervise arising from the misidentification of the defendant arrested.

liable for being "involved in investigation of evidence brought before . . . a trial jury, he would clearly be inhibited in his duty . . ."[88]   For this reason, a prosecutor's decision to investigate or not to investigate facts prior to bringing case to grand jury or trial is covered by absolute immunity.[89]

Third, Brickey is also entitled to absolute immunity in meeting with Dr. Frasier and members of the prosecution team in preparation for the preliminary hearing in the Plaintiff's case because those were "acts undertaken by a prosecutor in preparing for the initiation of [a] judicial proceeding[.]" [90]

In *Stein v. Disciplinary Board*,[91] the plaintiff argued, as does Plaintiff in the present case, that the Disciplinary Counsel's failed to do a proper investigation after the charge was filed by not contacting a key witness for the plaintiff until shortly before the trial.  The Tenth Circuit held:

> It is settled law, however, that actions taken by the prosecutor in preparation for trial in the role of advocate are protected by absolute immunity. *See Buckley*, 509 U.S. at 273 ("[A]cts undertaken by a prosecutor in preparing for the initiation of judicial proceedings or for trial, and which occur in the course of his role as an advocate for the State, are entitled to the protections of absolute immunity."). A decision regarding when during the course of

---

[88] *Grant*, 870 F.2d at 1139 (holding the prosecutor's decision to investigate or not to investigate facts prior to bringing case to grand jury or trial is covered by absolute immunity).

[89] *Id.*

[90] *Hunt*, 17 F.3d at 1267.

[91] 520 F.3d 1183.

litigation to contact an adverse witness is a prosecutorial, not an investigative, decision. It is therefore protected by absolute immunity.[92]

Allowing Plaintiffs to frame a grievance about the filing of unfounded charges as a claim for misconduct in investigation would improperly expose prosecutors to litigation concerning their exercise of discretion to prosecute.[93]

Similarly, in the present case, after the charges were filed, Brickey's decisions about what to ask the key witnesses at meetings in preparation for hearings or trial, what documents to subpoena, and what witnesses or institutions to subpoena, are all actions undertaken by the prosecutor in preparation for the preliminary hearing and trial. As such, these decisions occurred in the course of his role as an advocate for the State and are entitled to the protections of absolute immunity. Plaintiff cannot avoid that immunity merely by framing her grievances as misconduct in investigation.

3.      Failure to Supervise and Train

Plaintiff asserts that Brickey should be held liable for his acts and omissions in administering and supervising the investigation of the case performed by other members of the prosecution team.[94] In order to establish supervisor liability under § 1983 the Plaintiff must establish that an "'affirmative link' exists between the constitutional deprivation and either the supervisor's 'personal participation, his exercise of control or direction, or his failure to supervise.'"[95] In order to satisfy this standard, a plaintiff must show that "the

---

[92]*Id.* at 1194.

[93]*Id.*

[94]Docket No. 29 at 13.

[95]*Meade v. Grubbs*, 841 F.2d 1512, 1527 (10th Cir. 1988) (quoting *Specht v. Jensen*, 832 F.2d 1516, 1524 (10th Cir. 1987)).

defendant-supervisor personally directed the violation or had actual knowledge of the violation and acquiesced in its continuance."[96]

Plaintiff does not demonstrate the affirmative link necessary to establish supervisor liability. In her brief, Plaintiff asserts that Brickey failed to train or supervise the other Defendants because none of those "defendants disclosed the exculpatory pathology evidence to Brickey, or any member of the prosecution team."[97] This reasoning is not sufficient to establish the affirmative link necessary because it does not demonstrate that Brickey "directed the violation or had actual knowledge of the violation and acquiesced in its continuance."[98]

Further, these failure to train arguments are not supported by actual allegations in the Complaint that Brickey failed to train. While Plaintiff makes this argument in her brief,[99] the failure to train arguments about Brickey—that he failed to train and supervise the detectives, Drs. Frasier and Walker and Defendants IHC, Berman, and Anderson[100]—are not made in the Complaint.[101]

---

[96]*Jenkins v. Wood*, 81 F.3d 988, 994 (10th Cir. 1996).

[97]Docket No. 29 at 8. While Plaintiff makes this argument in her brief, the failure to train allegations against Brickey are not included in the Complaint. *Compare* Complaint at ¶ 309 alleging Anderson and ICH failed to train and supervise other defendants.

[98]*Jenkins*, 81 F.3d at 994.

[99]Docket No. 29 at 8.

[100]*Id.*

[101]Compl. ¶ 309 (alleging Anderson and ICH failed to train and supervise other defendants).

4.  Conclusion

Plaintiff fails to state a claim for relief under §1983 against Brickey because, considering all of the allegations as true, he is entitled to absolute immunity for all actions alleged in the Complaint.

5.  Due Process Clause of Utah Constitution[102]

Because Brickey is entitled to absolute immunity for the acts alleged in the complaint, the Court need not address Brickey's arguements that Plaintiff did not comply with the notice requirements of the Utah Governmental Immunity Act.  The Court finds that the prosecutor's common law immunity applies equally to the claims under the due process clause of the Utah Constitution.

D.      Anderson's Motion

1.  Claims

Plaintiff's claims against Anderson, the Utah DCFS director, in his individual capacity are based on the asserted inference that he had possession of the allegedly exculpatory records.[103]   Plaintiff contends that DCFS is an investigative agency that has the responsibility to turn over material exculpatory evidence to the prosecutor.  Plaintiff contends that this right was clearly established and, therefore, Anderson is not entitled to qualified immunity.  Plaintiff also contends that the due process claim under the Utah Constitution is self-executing and, therefore, the Utah Governmental Immunity Act does

---

[102]Art. I, § 7.

[103]Docket No. 31 (Pl.'s Opp. Mem. 6).

not apply.  Plaintiff contends she has met all three requirements for a claim under the due process clause.

Anderson asserts that the Plaintiff's §1983 claims should be dismissed because (1) the *Brady* duty to disclose evidence does not apply to him because *Brady* obligations fall on the prosecutor; and (2) even if a *Brady* duty applied to him, he is entitled to qualified immunity because the law was not clearly established that he had a duty to disclose the evidence.  As to the Plaintiff's failure to train or failure to affirmatively act theory, Anderson argues that Plaintiff has not met the elements necessary to establish supervisor liability. Anderson argues the state claim should be dismissed because (1) the Plaintiff failed to comply with notice provisions of the Utah Governmental Immunity Act and (2) Plaintiff failed to meet two out of three elements of the three-part test in *Spackman*.[104]

2.  Leave to Amend

In the absence of any allegation that DCFS and Anderson actually possessed or had control of the materials, the Court could not find a duty under *Brady* to turn over what they did not have.

Plaintiff first contends that such an allegation can be inferred from the Complaint. The Court has carefully reviewed the Complaint and finds no basis for such an inference.

_____

[104]*Spackman*, 200 UT ¶¶ 23-25 (holding that a plaintiff must establish three elements to proceed with a private suit for damages based on self-executing constitutional provision: (1) that he or she suffered a "flagrant violation" of his or her constitutional rights; (2) that "existing remedies do not redress" his or her injuries; and (3) that equitable relief is "wholly inadequate to protect" his or her rights or redress his or her injuries).

In contrast to the express allegations that Frasier,[105] Walker,[106] IHC/Beerman,[107] the Center,[108] and PCMC[109] were either aware of or actually possessed or had control of the pathology report and Townsend letter, there is no such allegation regarding DCFS or Anderson.[110]

In her Memorandum in Opposition and again at the hearing, Plaintiff sought leave to amend to make the express allegation that DCFS was in possession of the records. Defendant opposed the request stating that an amendment could not be made without investigation and a factual basis for such an allegation.

Because responsive pleadings have been filed by two Defendants, Plaintiff must seek leave of the court to amend by filing a motion.[111]  Such leave "shall be freely given

---

[105]Compl. ¶ 120-22 (alleging Frasier became aware of pathology report and Townsend letter).

[106]Id. ¶ 175 (alleging Walker received pathology report and Townsend letter).

[107]Id. ¶ 183 (alleging that the IHC department that Beerman administered had control of the pathology slides, the pathology report and the Townsend letter).

[108]Id. ¶ 118-19, 172-3 (alleging pathology report and Townsend letter were sent to and copies kept at Center).

[109]Id. ¶ 182 (alleging PCMC had control of pathology slides, pathology report and Townsend letter).

[110]Id. ¶ 194-95 (alleging Anderson received subpoena, had duty to produce all records, and did not produce the pathology Report or Townsend letter; but not alleging that either Anderson or DCFS were aware of, or had possession or control of, the same).

[111]Fed. R. Civ. P. 15(a)(2).

when justice so requires."[112] The Plaintiff's single sentence, "bare request in [her] response to a motion to dismiss" is insufficient to constitute a proper motion for leave to amend.[113] However, a request made at the hearing is an exception to the general requirement that a "request for leave to amend must be in writing."[114]   The Court finds that Anderson had notice of the request for leave to amend and had an opportunity to respond at the hearing.

The Court finds that the interest of justice requires leave be granted.  The Court finds that the issue of whether DCFS employees can have a duty under *Brady* and the scope of any such duty is too significant to be determined except in the context of the actual allegations in this case.  The Court will grant Plaintiff leave to file an amended Complaint no later than 20 days from entry of this order.

Similarly, whether DCFS or Anderson individually are actually alleged to have had the documents is relevant to the *Spackman* element of whether there was a "flagrant violation" of clearly established rights.  In order for there to be a "flagrant violation" the "*defendant* must have violated the clearly established rights of which a reasonable person would have known."[115]

---

[112]*Id.*

[113]*Calderon v. Kansas Dep't of Social and Rehab. Serv.,* 181 F.3d 1180, 1186-87 (10th Cir. 1999) (finding no abuse of discretion in failing to address request to cure deficiencies in pleading where plaintiff's "single sentence, lacking a statement for the grounds for amendment and dangling at the end of her memorandum, did not rise to the level of a motion for leave to amend").

[114]Fed. R. Civ. P. 7(b)(1)(A) (providing request must be in writing "*unless* made during a hearing or trial") (emphasis added).

[115]*Spackman*, 2000 UT at ¶ 23 (emphasis added).

31

## V.  CONCLUSION

The Court grants Defendants IHC's, Beerman's, and Brickey's Motions to Dismiss. The Court also dismisses the claims for injunctive relief.  As to Defendant Anderson's Motion, the Court denies Anderson's Motion to Dismiss without prejudice and grants Plaintiff leave to file an amended Complaint.

## VI.  ORDER

Based upon the foregoing, it is therefore

ORDERED that the Fifth and Sixth Claims for Relief are DISMISSED.  It is further

ORDERED that IHC's and Beerman's Motion to Dismiss (Docket No. 18) is GRANTED and all claims against them are DISMISSED.  It is further

ORDERED that Brickey's Motion to Dismiss (Docket No. 21) is GRANTED and all claims against him are DISMISSED.  It is further

ORDERED that Anderson's Motion to Dismiss (Docket No. 25) is DENIED WITHOUT PREJUDICE.  It is further

ORDERED that Plaintiff is granted leave to file an amended complaint within twenty days of the entry of this Order.  If no amended Complaint is filed within that time, Defendant Anderson may renew his Motion to Dismiss and rely on the prior memoranda.

DATED   September 29, 2008.

BY THE COURT:

_____

TED STEWART
United States District Judge

32