IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| ABBY TISCARENO, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>LORI FRASIER, et al.,<br><br>Defendants. | **MEMORANDUM DECISION AND ORDER**<br><br>Case No.  2:07-CV-336<br><br>Judge Clark Waddoups |

## INTRODUCTION

Before the court are Defendants Intermountain Health Care ("IHC") and William Beerman's ("Mr. Beerman") motion to dismiss and/or for summary judgment [Dkt. No. 139], Defendant Richard Anderson's ("Mr. Anderson") motion to dismiss [Dkt. No. 141], and Plaintiffs' motion to strike Defendant Dr. Lori Frasier's ("Dr. Frasier") insufficient defenses and for sanctions [Dkt. No. 169].  For the reasons discussed below, the court GRANTS Defendants IHC and Beerman's motion to dismiss, GRANTS Defendant Anderson's motion to dismiss, and GRANTS in part and DENIES in part Plaintiffs' motion to strike and for sanctions.

## BACKGROUND

This matter arises out of the conviction and subsequent acquittal of Plaintiff Abby Tiscareno for child abuse.  The following facts are taken from the Plaintiffs' Amended Complaint.  Ms. Tiscareno, a former proprietor of a state licensed daycare center, was accused and prosecuted for the abuse of one of the children entrusted to her care after the child

(hereinafter "N.M.") was found unresponsive and breathing heavily.  After trying to revive N.M,
Ms. Tiscareno called 911 and N.M. was transported to Primary Children's Medical Center
("PCMC") in Salt Lake City, Utah for treatment and evaluation.

N.M. was submitted to a CT scan upon admission to PCMC, and was immediately taken
to surgery to relieve pressure on the brain.  Dr. Marion Walker ("Dr. Walker") performed the
surgery and reviewed the CT scan of N.M.  During the operation, samples of a subdural
hematoma, or clot, were removed from N.M.'s head and sent to the pathology department at
PCMC for further examination.  Dr. Walker did not indicate that he had sent a sample of the clot
to the pathology department, nor did he make reference to the results of the pathology
examination in any subsequent progress notes regarding N.M.

The pathology examination revealed, in relevant part, that the sample clot taken from
N.M.'s head during surgery contained fresh blood and older blood from a prior bleed.  This
conclusion was included in a pathology report prepared by Dr. Theodore J. Physher, M.D., the
Director of the Pathology Department at PCMC.  A second report by Dr. Jeanette Townsend
concurred in the finding that the sample taken from N.M.'s head contained both fresh blood and
old blood from a prior bleed.  In total, three separate pathologists at PCMC agreed that the
sample from N.M.'s head contained evidence of a prior bleed.  Copies of Dr. Physer and Dr.
Townsend's reports were sent to the Center for Safe and Healthy Families ("the Center") located
at PCMC.

Dr. Lori Frasier, the Medical Director of the Assessments Team of the Center, reviewed
the CT scans of N.M.'s head and body on the same day N.M. was admitted to PCMC.  She also
conducted a physical examination of N.M. and interviewed N.M.'s father.  After her evaluation,
Dr. Frasier determined that N.M.'s injury was highly suspicious and decided to contact the

Department of Child and Family Services ("DCFS") and law enforcement to investigate the possibility that the injury was the result of abuse. Dr. Frasier's conclusion was that the injury could only have happened while N.M. was in the care of Ms. Tiscareno on the same day that N.M. was admitted to PCMC.

Dr. Frasier consulted with Dr. Walker during the evening of the day that N.M. was admitted to PCMC and discussed whether there was evidence of old blood in N.M.'s head during surgery. Dr. Walker indicated that he had not seen any evidence of prior bleeding during the operation, and Dr. Walker and Dr. Frasier agreed that indications of prior bleeding in the CT scan report were incorrect. Neither doctor consulted or discussed the findings of the pathology examination of the blood clot sample taken from N.M.'s head.

Dr. Frasier contacted Detective Andrew Leatham ("Detective Leatham") of the Summit County Sheriff's Office on that same evening and informed him that N.M. had sustained a massive brain injury caused by severe shaking and possible blunt force trauma, although there were no outward signs of such trauma. Dr. Frasier also indicated that N.M. would have experienced no period of normalcy after the shaking and would have been unconscious immediately thereafter, which suggested that the incident could only have occurred while N.M. was in Ms. Tiscareno's care. These same conclusions were confirmed by Dr. Frasier to Detective Mike Dorman ("Detective Dorman") three days later, at which time Dr. Frasier offered a three-page written report indicating that the injuries could only have occurred while N.M. was in Ms. Tiscareno's care. Based on these facts, Detective Dorman determined there was probable cause to arrest Ms. Tiscareno. Two days later, a search warrant was executed on Ms. Tiscareno's home and she was afterwards arrested. Ms. Tiscareno was charged by information with Second Degree Felony Child Abuse.

After being charged, Ms. Tiscareno's first attorney made a formal request that the prosecution produce copies of the information, police reports, and any other evidence in the criminal case against her. The Summit County Chief Prosecutor, Mr. David Brickey, provided Ms. Tiscareno's attorney with the information and several police reports and indicated that additional evidence would be provided as soon as additional discovery was completed. Additional evidence, including medical records, were later forwarded to Ms. Tiscareno's attorney, and Mr. Brickey indicated that he would continue to forward evidence as it was received by his office.

Although they had been served with subpoenas and/or requests for production of the medical records of N.M., neither Dr. Frasier nor Dr. Walker produced the pathology slides or reports at issue to Mr. Brickey. The pathology slides and examination reports were allegedly part of N.M.'s medical records at PCMC at all relevant times.

William Beerman, the former Director of Patient Administration at PCMC, and IHC, the owner and operator of PCMC, also received one or more subpoenas to produce the complete medical records of N.M. Neither Mr. Beerman nor IHC produced the requested pathology slides or reports at issue to Mr. Brickey.

Richard Anderson, the Director of DCFS during the relevant time, also received one or more subpoenas and/or requests from Mr. Brickey regarding the abuse charges brought against Ms. Tiscareno. DCFS maintained an office at PCMC at the relevant time. Mr. Anderson did not produce the pathology slides or reports at issue.

Neither Dr. Frasier nor Dr. Walker informed Mr. Brickey or other members of the prosecution team of: (1) the fact that Dr. Walker had sent a small portion of the blood clot he removed to the Pathology Department for examination, (2) the pathology slides, or (3) the

pathology examination reports.  As a result, Ms. Tiscareno's attorneys were not furnished with

evidence of the pathology examination nor its results prior to Ms. Tiscareno's first trial.

At Ms. Tiscareno's first trial, both Dr. Frasier and Dr. Walker testified on behalf of the

prosecution that N.M.'s injury was "fresh."  Dr. Walker also testified that a sample of the tissue

removed from N.M.'s head during surgery was sent to pathology for examination and that,

according to his recollection, the results of the pathology examination showed a "bland clot" and

that there was nothing spectacular about it.  Dr. Walker's testimony was allegedly the first time

he had mentioned the pathology examination at issue in the presence of the prosecution team.

Evidence of the CT scan that showed the presence of old blood in N.M.'s head prior to

surgery was also presented at the trial in an attempt to contradict the prosecution's theory that

the relevant injury could only have occurred while N.M. was in the care of Ms. Tiscareno.

According to radiologist, the CT scan showed two densities of blood, suggesting old bleeding

and fresh bleeding.  Both Dr. Frasier and Dr. Walker testified that, in their professional opinions,

there was no evidence of pre-existing bleeding in N.M.'s head.  The jury convicted Ms.

Tiscareno of child abuse in her first trial.

After her conviction, Ms. Tiscareno hired a new attorney who subpoenaed PCMC for the

pathology reports discussed by Dr. Walker during the first trial.  A petition for a new trial was

also filed, which was granted on the grounds of improper jury instructions.

During the second trial, Dr. Frasier and Dr. Walker again testified that the evidence

showed that N.M.'s injuries were fresh.  On cross-examination, however, Dr. Frasier admitted

that she did not consult with the pathologists who performed the pathology examination on the

clot removed from N.M.'s head prior to coming to the conclusion that blood in N.M.'s head was

not the result of a prior bleed.  She also admitted that she was aware of the results of the

pathology examination that indicated prior bleeding in N.M.'s brain and that the jury in the first

trial was given inaccurate information about whether there was a prior bleed because they were

not informed about the results of the pathology examination.

On cross-examination at the second trial, Dr. Walker testified that the conclusion of the

radiologist who read the CT scan and found evidence of a prior bleed was a reasonable one.  He

also testified that it was possible that blood in N.M.'s head could have been a result of re-

bleeding from an older clot and that any trauma that could cause such a re-bleed could be fairly

minor.  He also testified that there could be periods of lucidity between the time of trauma and

the time the victim became unconscious.

At the conclusion of the second trial, Ms. Tiscareno was found not guilty and the charges

against her were dismissed.

As a result of the prior erroneous conviction of Ms. Tiscareno and incidents related to the

failure to disclose evidence of the pathology examination at issue, Plaintiffs filed the matter

currently before this court, alleging various violations of Plaintiffs' federal and state

constitutional rights by Defendants Beerman, IHC, Anderson, Frasier, Walker, and others.

## ANALYSIS

### I.  DEFENDANTS IHC AND BEERMAN'S MOTION TO DISMISS AND/OR FOR SUMMARY JUDGMENT

In their Amended Complaint, Plaintiffs claim that Defendants IHC and Beerman should

be held liable for violating the Due Process Clause of the Fourteenth Amendment by failing to

respond properly to official records requests and/or for failing to disclose exculpatory evidence

in their possession.  Plaintiffs bring their claim for relief for federal constitutional violations

pursuant to 42 U.S.C. § 1983.  Plaintiffs have also brought a claim against Defendants IHC and

Beerman for violation of Plaintiffs' due process rights under the Utah Constitution.

Defendants IHC and Beerman have moved to dismiss these claims and/or for summary judgment arguing that they cannot be held liable for federal constitutional violations because, for purposes of the claims brought against them, they have not engaged in state action. Furthermore, Mr. Beerman argues that even if the court were to find that he was a state actor for purposes of Plaintiffs' Section 1983 claims against him, he would be entitled to qualified immunity because his conduct did not violate a clearly established right belonging to Plaintiffs. Additionally, IHC argues that the claims against it should be dismissed because Plaintiffs have failed to allege a policy or practice of not properly producing records.

### A.  STANDARD OF REVIEW

When evaluating a motion to dismiss under Rule 12(b)(6),[1] the court "must accept all the well-pleaded allegations of the complaint as true and must construe them in the light most favorable to the plaintiff."  *David v. City & County of Denver*, 101 F.3d 1344, 1352 (10th Cir. 1996).  The court need not, however, consider allegations which are conclusory, or that "do not allege the factual basis" for the claim.  *Brown v. Zavaras*, 63 F.3d 967, 972 (10th Cir. 1995); *see also Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991) ("[C]onclusory allegations without supporting factual averments are insufficient to state a claim on which relief can be based.").  Moreover, the court is not bound by a complaint's legal conclusions, deductions, and opinions couched as facts.  *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, (2007) (citations omitted).

---

[1] Because Defendants filed the present motion after filing their Answer [Dkt. No. 121], this motion cannot technically be considered a Rule 12(b)(6) motion to dismiss.  *See* Fed. R. Civ. P. 12(b) ("A motion asserting any of these defenses must be made before pleading if a responsive pleading is allowed.").  However, Rule 12(h)(2)(B) allows the defense of "failure to state a claim for which relief can be granted" by a motion for judgment on the pleadings under Rule 12(c).  Because the distinction between the two motions is purely formal, the court must review a Rule 12(c) motion under the same standard that governs a Rule 12(b)(6) motion.  *See Ward v. Utah*, 321 F.3d 1263, 1266 (10th Cir. 2003); *Marshall v. Whirlpool Corp.*, No. 07-CV-534-JHP-TLW, 2010 WL 348344 (N.D. Okla. Jan. 26, 2010) (unpublished).

Although all reasonable inferences must be drawn in the non-moving party's favor, a complaint will only survive a motion to dismiss if it contains "enough facts to state a claim to relief that is plausible on its face." *Ridge at Red Hawk, LLC v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007) (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Under this standard, a claim need not be probable, but there must be facts showing more than a "sheer possibility" of wrongdoing. *Id.*

When a motion to dismiss under Rule 12(b)(6) presents matters outside the pleadings, federal courts have discretion to exclude such matters or recognize them. *See* Fed. R. Civ. P. 12(d) (2012). *See also Fonte v. Bd. of Managers of Continental Towers Condominium*, 848 F.2d 24, 25 (2d Cir. 1988) ("[T]he court may exclude the additional material and decide the motion on the complaint alone or it may convert the motion to one for summary judgment . . . and afford all parties the opportunity to present supporting material."); *Ellis v. Cassidy*, 625 F.2d 227, 229 (9th Cir. 1980). If a court does not expressly exclude matters outside the pleading from its consideration of such a motion, the motion must be treated as one for summary judgment and all parties "must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d). *See also Alexander v. Oklahoma*, 382 F.3d 1206, 1214 (10th Cir. 2004).

Because Defendants IHC and Beerman have presented facts and evidence outside the pleadings in support of their motion to dismiss and/or for summary judgment, the court must determine whether to exclude such extraneous material from consideration or convert the motion into a motion for summary judgment. Because Defendants' motion can be resolved on the

pleadings alone, the court will disregard all extraneous matters presented in the present motion and will treat it as a motion to dismiss.

### B. STATE ACTION

In order to state a claim for which relief can be granted under 42 U.S.C. § 1983, plaintiffs must plead facts that show that they have been deprived of a federal constitutional right and that defendants deprived them of this right while acting under color of state law. *Flagg Bros., Inc. v. Brooks*, 436 U.S. 149 (1978). *See also Johnson v. Rodrigues*, 293 F.3d 1196, 1202 (10th Cir. 2002). A person or entity does not have to be an official of the state in order to be acting under color of state law. Indeed, a private person or entity can be liable under Section 1983 if their actions violate someone else's federal constitutional rights and constitute state action. *See Johnson*, 293 F.3d at 1202.

To determine whether a private party has engaged in state action for purposes of Section 1983, the Supreme Court has established a two-part test:

> First, the deprivation must be caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the state or by a person for whom the State is responsible ... Second, the party charged with the deprivation must be a person who may fairly be said to be a state actor. This may be because he is a state official, because he has acted together with or has obtained significant aid from state officials, or because his conduct is otherwise chargeable to the State.

*Lugar v. Edmonson Oil Co. Inc.*, 457 U.S. 922, 937 (1982). "[M]erely private conduct, no matter how discriminatory or wrongful," cannot provide the grounds for a claim brought under Section 1983. *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 50 (1999) (quoting *Blum v. Yaretsky*, 457 U.S. 991, 1002 (1982)).

While the Supreme Court has emphasized that the state action inquiry is one that is necessarily fact-intensive, *see Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S.

288 (2001), federal courts have developed several "tests" to help determine whether a private party should be deemed a state actor for purposes of Section 1983. *See Johnson*, 293 F.3d at 1202. The Tenth Circuit has identified four tests to aid in the inquiry: (1) the public function test, (2) the nexus test, (3) the symbiotic relationship test, and (4) the joint action test. *Johnson*, 293 F.3d at 1202 (citing *Gallagher v. "Neil Young Freedom Concert"*, 49 F.3d 1442 (10th Cir. 1995)).

 1.   The Public Function Test

The public function test instructs courts to deem a private party a state actor when the state has delegated to such party "a function traditionally exclusively reserved to the States." *Gallagher*, 49 F.3d at 1447. The public function test is rarely helpful, as "very few [functions] have been exclusively reserved to the State." *Flagg Bros.*, 436 U.S. at 158 (quotation marks and citation omitted). Examples of such functions include the holding of elections, the performance of necessary municipal functions, or the running of a nursing facility. *Johnson*, 293 F.3d at 1203.

Plaintiffs assert that the state allowed IHC and Mr. Beerman to "exercise public functions and powers traditionally and exclusively reserved to the state" when DCFS delegated to IHC and its staff, including Mr. Beerman, its duty to investigate suspected child abuse of patients initially evaluated at PCMC. *See* Amended Complaint 9 [Dkt. No. 79.] Plaintiffs have not, however, alleged facts that support the legal conclusion that the activities of IHC and Mr. Beerman were activities that are traditionally exclusively reserved to the state. IHC is a private corporation that provides medical services and examinations to the general public. Mr. Beerman was an administrator at PCMC who managed and supervised the production of medical records lawfully requested in connection with the prosecution of criminal cases. Neither activity can reasonably

be said to fall within the class of activities that are traditionally exclusively reserved to the state. Furthermore, Plaintiffs have not alleged that IHC and/or Mr. Beerman have engaged in activities that go beyond their normal course of private business.  Therefore, application of the public function test does not indicate any state action on the part of IHC or Mr. Beerman.

>    2.  The Nexus Test

The nexus test allows state action to be imputed to a private party when "there is a sufficiently close nexus between the government and the challenged conduct such that the conduct may be fairly treated as that of the State itself."  *Gallagher*, 49 F.3d at 1448 (citing *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 351 (1974)).  Such a nexus exists only when a state "has exercised coercive power or has provided such significant encouragement, either overt or covert, that the [private conduct] must in law be deemed to be that of the State."  *Id*. (citing *Blum*, 457 U.S. at 1004).

Plaintiffs assert that "the State of Utah, through DCFS, encouraged IHC, Beerman, Frasier, and Walker not to produce the medical records tending to exculpate Plaintiff . . . by failing to promulgate or adopt any official policies, procedures, rules, regulations, or contractual provisions requiring [Defendants] to perform this delegated duty."  *See* Amended Complaint 11-12 [Dkt. No. 79.]  Plaintiffs also allege that DCFS's failure to provide training, supervision, and monitoring and its failure to perform its duty to perform independent investigations of child abuse cases where potential victims were first evaluated at PCMC also encouraged IHC and Mr. Beerman not to produce the medical records at issue.  While these alleged failures of DCFS might constitute a failure to encourage compliance with the law, it does not constitute the "significant encouragement" or coercion that is required to fairly call the actions of Defendants state action.  Furthermore the absence of intervention from the State in the investigation of child

abuse and the production of medical evidence supports the conclusion that there is little to no

nexus between the actions of the State and the conduct of Defendants in this matter.  Because

Plaintiffs have failed to show any significant nexus between the conduct of the Defendants and

the State, the nexus test cannot provide the grounds for this court finding that Defendants

engaged in state action for the purposes of Section 1983.

 3. The Symbiotic Relationship Test

 Under the symbiotic relationship test, a private party is deemed to have been a state actor

when the state has "so far insinuated itself into a position of interdependence with a private party

that it must be recognized as a joint participant in the challenged activity."  *Gallagher*, 49 F.3d at

1451 (citing *Burton v. Wilmington Parking Auth.*, 365 U.S. 715, 725 (1961)) (quotation marks

omitted).  "[E]xtensive state regulation, the receipt of substantial state funds, and the

performance of important public functions do not necessarily establish the kind of symbiotic

relationship between the government and a private entity that is required for state action."  *Id*.

The Supreme Court has referred to the symbiosis required to impute state action to a private

party as "entwinement."  *See Brentwood Acad.*, 531 U.S. at 302.  It is clear that the symbiotic

relationship test implies more than a mere reliance on the state for support or guidance.  Instead,

the test suggests that a private party may be considered a state actor when the activities of the

state and the activities of the private actor are so interconnected that it is fair to call the actions

of the private party the actions of the state.  *See Lugar*, 457 U.S. at 937.

 Plaintiffs assert that such a symbiotic relationship existed between Defendants and the

State of Utah as a result of DCFS's alleged delegation of its duty to investigate child abuse to

IHC and its employees when a potential victim of child abuse was evaluated at PCMC.

Plaintiffs' own allegations, however, contradict this assertion.  Plaintiffs have alleged that DCFS

failed to train IHC and its staff and failed to promulgate policies and practices to ensure the protection of Defendants' constitutional rights.  Furthermore, Plaintiffs have alleged that DCFS failed to conduct independent investigations or reviews of the evidence produced by IHC and its staff in conducting medical examinations of potential victims of child abuse.

These allegations suggest that the relationship between DCFS and IHC and its staff members was more like the relationship between an employer and an independent contractor than it was like the symbiotic relationship that would lead a reasonable person to conclude that IHC and its staff were acting as a joint participant in state action.  Plaintiffs allegation that DCFS relied on IHC and its staff to conduct medical examinations and produce medical records when subpoenaed does not support the conclusion that the State of Utah had "so far insinuated itself into a position of interdependence" with IHC and its staff that Defendants "must be recognized as a joint participant in the challenged activity."  Therefore, the symbiotic relationship test does not show any state action on the part of Defendants.

4.  The Joint Action Test

According to the joint action test, a private party is a state actor if it is a "willful participant in joint action with the State or its agents."  *Gallagher*, 49 F.3d at 1453 (quoting *Dennis v. Sparks*, 449 U.S. 24 (1980)).  The essential inquiry is "whether state officials and private parties have acted in concert in effecting a particular deprivation of constitutional rights." *Id*.  States and private parties act in concert when "there is a substantial degree of cooperative action between state and private officials, or if there is overt and significant state participation in carrying out the deprivation of the plaintiff's constitutional rights."  *Johnson*, 293 F.3d at 1205. (quotation marks and citation omitted).

The specific constitutional deprivation alleged in this case is the failure of IHC and Mr. Beerman to produce certain medical records pursuant to a subpoena, and/or their failure to deliver evidence that is potentially exculpatory to the prosecutor in this case.  Plaintiffs have made no specific allegations that the State of Utah or its agents were involved jointly or cooperatively in this conduct.  Instead, they merely allege that IHC, its staff, and the state have a general relationship when it comes to the investigation of child abuse.  Such general allegations do not support a finding of state action under the joint action test.  The joint action test looks for evidence that the state and a private party acted together to effect a *particular* deprivation of a constitutional right.  General allegations of a relationship between private actors and the state are not sufficient to show state action.

5.  Conclusion

Plaintiffs have failed to allege facts sufficient for the court to find that IHC or Mr. Beerman engaged in state action by failing to produce potentially exculpatory evidence pursuant to a subpoena or some other independent duty.[2]  Therefore, Plaintiffs' federal claims brought under 42 U.S.C. § 1983 must be dismissed against IHC and Mr. Beerman.  The court notes that neither IHC nor Mr. Beerman mentioned the state law claim brought against them by Plaintiffs in their motion to dismiss and/or for summary judgment.  Therefore, that claim remains alive.

## II.     DEFENDANT ANDERSON'S MOTION TO DISMISS STATE CONSTITUTIONAL CLAIM

In a previous order which was later reversed by the Tenth Circuit Court of Appeals, this court held that Mr. Anderson, the former director of DCFS, was not entitled to qualified

---

[2] Plaintiffs suggest that Defendants IHC and Beerman had a constitutional duty to produce exculpatory evidence independent of their duty to respond to a valid subpoena.  *See* Amended Complaint 54 [Dkt. No. 79.]  As the court finds that neither IHC nor Mr. Beerman engaged in state action by failing to produce the pathology slides and reports, it does not reach the question of whether they had a constitutional duty to produce exculpatory evidence independent of their duty to respond to the subpoena.

immunity from the Plaintiffs' federal constitutional claim brought against him. *See* Mem. Dec. and Order 7-16 [Dkt. No. 113.] This court also held that Plaintiffs' state law claim was not subject to the notice requirement of the Utah Governmental Immunities Act ("UGIA") and that said claim would not be dismissed on the grounds that the alleged state constitutional violation was not clearly established. The Tenth Circuit reversed this court's decision with respect to both claims, holding that Mr. Anderson was indeed entitled to qualified immunity on the federal constitutional claim brought against him because case law had not clearly established that he had a constitutional duty under *Brady v. Maryland*, 373 U.S. 83 (1963) to produce exculpatory evidence to Ms. Tiscareno's attorneys. *Tiscareno v. Anderson*, 639 F.3d 1016, 1023-24 (10th Cir. 2011). The Tenth Circuit relied on the same reasoning to dismiss Plaintiffs' state constitutional claim against Mr. Anderson. *Id.*

Following the Tenth Circuit's ruling on the claims against Mr. Anderson, the Utah Supreme Court held that the UGIA did not apply to claims alleging state constitutional violations. *Jensen v. Cunningham*, 2011 UT 17, ¶51, 250 P.3d 465. In light of that decision, the Tenth Circuit granted a request for a panel rehearing with respect to the state constitutional claim brought against Mr. Anderson. Upon rehearing, the Tenth Circuit vacated its previous opinion with respect to the state constitutional claim and affirmed this court's ruling that the notice requirement of the UGIA did not apply to the state constitutional claim brought by Plaintiffs. The Tenth Circuit's revised opinion, however, did not address the issue of whether the alleged state constitutional violation was clearly established.

Mr. Anderson now petitions this court to revise its previous order and dismiss the state constitutional claim that Plaintiffs have brought against him on the grounds that he did not commit a "flagrant" violation as required by Utah law for an award of damages. *See* Mot. to

Dismiss State Constitutional Claim 2 [Dkt. No. 141.]  Plaintiffs oppose such a dismissal, arguing that the law of the case doctrine should prevent this court from revising its previous order with respect to Plaintiffs' state law claim and that, regardless, Mr. Anderson has not shown that the allegations made in Plaintiffs' Amended Complaint fail to state a claim.

### A.  LAW OF THE CASE

The law of the case doctrine is a rule of judicial economy that is based on "sound public policy that litigation should come to an end and is designed to bring about a quick resolution of disputes by preventing continued re-argument of issues already decided."  *Gage v. General Motors Corp.*, 796 F.2d 345, 349 (10th Cir. 1986) (citations omitted).  It posits that "when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case."  *United States v. Monsisvais*, 946 F.2d 114, 115 (10th Cir. 1991) (quoting *Arizona v. California*, 460 U.S. 605, 618 (1983)).  Similar to the doctrine of res judicata, the law of the case doctrine encourages parties to "present all available claims and defenses at the earliest opportunity."  *McIlravy v. Kerr-McGee Coal Corp.*, 204 F.3d 1031, 1035 (10th Cir. 2000).

The law of the case doctrine, however, only applies when there has been a final decision. *Gage*, 796 F.2d at 349 (citing *United States v. United States Smelting Co.*, 339 U.S. 186, 198-99 (1950)).  Thus, the law of the case doctrine would apply to legal issues decided by an appellate court prior to a case being remanded, *see McIlravy*, 204 F.3d at 1034, or when a district court reviews matters previously considered in a state court involving the same parties, *see Gage*, 796 F.2d at 349.  The rule does not apply, however, to legal issues previously decided by a court in a non-final order.  *See Rimbert v. Eli Lilly & Co.*, 647 F.3d 1247, 1251 (10th Cir. 2011).  "District courts generally remain free to reconsider their earlier interlocutory orders."  *Been v. O.K.*

*Indus.*, 495 F.3d 1217, 1225 (10th Cir. 2007). *See also Elephant Butte Irrigation Dist. v. U.S. Dep't of Interior*, 538 F.3d 1299, 1306 (10th Cir. 2008) ("[E]very order short of a final decree is subject to reopening at the discretion of the district judge.") (citation omitted); Fed. R. Civ. P. 54(b) ("[A]ny order . . ., however designated, which adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties . . . may be revised at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties.").

As there has not been a final adjudication of Plaintiffs' state constitutional claims against Mr. Anderson, the court is not barred by the law of the case doctrine from revisiting its previous interlocutory order denying Mr. Anderson's motion to dismiss. The court chooses to exercise that discretion and revisit the legal sufficiency of Plaintiffs' state constitutional claim against Mr. Anderson.

### B. PLAINTIFFS' FAIL TO ALLEGE A "FLAGRANT" VIOLATION OF RIGHTS GUARANTEED BY THE UTAH CONSTITUTION

In order to be awarded monetary damages for injuries caused by a violation of a provision of the Utah Constitution, a plaintiff must clear two hurdles. *See Jensen*, 2011 UT 17, ¶ 58. First, "the plaintiff must prove that the constitutional provision violated is selfexecuting." *Id*. (quotation marks omitted). If a constitutional provision is "selfexecuting," the plaintiff must then establish three elements: (1) that the plaintiff "suffered a flagrant violation of his or her constitutional rights;" (2) that "existing remedies do not redress his or her injuries;" and (3) that "equitable relief, such as an injunction, was and is wholly inadequate to protect the plaintiff's rights or redress his or her injuries." *Id*. (quotation marks and citation omitted).

Plaintiffs allege that Mr. Anderson violated Ms. Tiscareno's right to due process of law under Article 1, Section 7 of the Utah Constitution. *See* Amended Complaint 56 [Dkt. No. 79.] The Utah Supreme Court has made clear that Utah's due process clause found in Article 1,

Section 7 is a "selfexecuting" provision that can provide the grounds for an award of damages. *See Jensen*, 2011 UT 17, ¶ 61; *Spackman ex rel. Spackman v. Bd. of Educ. of Box Elder County Sch. Dist.*, 2000 UT 87, ¶18, 16 P.3d 533.  Therefore, Plaintiffs' Utah due process claim against Mr. Anderson passes the first legal hurdle required to bring a valid legal claim for damages as a result of a state constitutional violation in Utah.

Next, in order to have a valid claim for damages, Plaintiffs must show that the alleged state constitutional violation by Mr. Anderson was "flagrant."  A "flagrant" violation is conduct that violates "clearly established constitutional rights of which a reasonable person would know."  *Jensen*, 2011 UT 17, ¶ 66 (quotation marks and citation omitted).  Following the definition of "clearly established" set forth by the United States Supreme Court in *Anderson v. Creighton*, 483 U.S. 635, 639-40 (1987), the Utah Supreme Court has said that a right is clearly established when "its contours are sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Jensen*, 2011 UT 17, ¶ 66 (quotation marks and citation omitted).  Therefore, the "flagrant" violation requirement "ensures that a government employee is allowed the ordinary human frailties of forgetfulness, distractibility, or misjudgment without rendering [him or her]self liable for a constitutional violation."  *Id.* (quotation marks and citation omitted).

Plaintiffs specifically allege that Mr. Anderson is liable for violating Ms. Tiscareno's due process rights under the Utah Constitution by "failing to identify, disclose and provide materially exculpatory evidence to [prosecutors]" contrary to the duty established in *Brady*.  Amended Complaint 60 [Dkt. No. 79.]  Furthermore, Plaintiffs allege that Mr. Anderson, as head of DCFS, violated Ms. Tiscareno's due process rights by failing to establish policies and procedures to ensure that doctors working with DCFS properly disclosed potentially exculpatory evidence to

prosecutors.  The Tenth Circuit, however, has already determined that, at least with respect to

Plaintiffs' federal constitutional claim, Mr. Anderson did not violate any clearly established duty

to disclose or establish policies to ensure that others disclose exculpatory evidence in this case.

*See Tiscareno*, 639 F.3d at 1024 ("It was not clearly established at any time during the

investigation of N.M.'s abuse that a child services agency, under state reporting requirements,

had a duty pursuant to *Brady* to unearth, or train others to reveal, exculpatory evidence.").

Accordingly, the question this court must now answer is whether such duties would be

clearly established under Utah law with respect to a violation of the Utah Constitution.  The Utah

Supreme Court has clearly indicated that "the standards for determining whether a plaintiff is

entitled to damages for a state constitutional violation differ from the standards for assessing

claims under the federal constitution."  *Jensen*, 2011 UT 17, ¶ 45.  Even where the language of

the federal constitution is substantially the same as the language in a provision in the Utah

Constitution, "similarity of language does not indicate that [the Utah Supreme Court] moves in

lockstep with the United States Supreme Court's [constitutional] analysis."  *Id*. at ¶ 46 (quotation

marks and citation omitted).  Thus, the mere fact that a violation is not "clearly established"

under the federal constitution does not necessarily indicate that the same violation would not be

"clearly established" under the Utah Constitution.

Nevertheless, Utah has adopted the United States Supreme Court's standard for

determining whether a state constitutional right is "clearly established."  *Id*. at ¶ 66 (citing

*Harlow v. Fitzgerald*, 457 U.S. 800 (1982) and *Anderson v. Creighton*, 483 U.S. 635 (1987) to

define "clearly established").  Therefore, in order to show that a right that is not clearly

established under the federal constitution is clearly established under the Utah Constitution, a

plaintiff must show that the protection afforded by the Utah Constitution is broader than that provided by the federal constitution.

Plaintiffs have not cited any statute or precedent to show that the duty to disclose exculpatory evidence that arises out of the Utah Constitution's due process clause is broader than the duty that arises under the federal constitution requirement established by *Brady* and its progeny. Additionally, this court's own research has not uncovered any indication that a broader duty to disclose exists under Utah law. Indeed, the court has found no instances where the Utah Supreme Court has analyzed the due process clause of the Utah Constitution separately from its analysis of the federal constitution with respect to the disclosure of exculpatory evidence. While there may be instances where conduct is "so egregious and unreasonable that it constitutes a flagrant violation of a [Utah] constitutional right even in the absence of controlling precedent," *Jensen*, 2011 UT 17, ¶ 67, the alleged conduct of Mr. Anderson, in this case, does not rise to that level.

In the absence of clear precedent showing that the duty of a person in Mr. Anderson's position to disclose exculpatory evidence is broader under the Utah Constitution than under the federal constitution, this court will not find that such a violation is "clearly established" under Utah law when it would not be under federal law. Therefore, Plaintiffs have failed to plead facts sufficient to state a claim that Mr. Anderson committed a flagrant violation of a right guaranteed by the Utah Constitution.

Plaintiffs argue that they should be allowed to conduct additional discovery before the court makes its determination that there are not sufficient facts. Plaintiffs fail, however, to suggest facts they believe would be discovered that would support their claims. Under *Iqbal*, the Court has stated that a plaintiff is required to plead sufficient facts to make the claim plausible

before being entitled to open the doors of discovery.  556 U.S. at 678-79.  A plaintiff is not entitled to impose on a defendant the burden of discovery unless a plaintiff can plead such facts.  Here, Plaintiffs have failed to plead sufficient facts to show that a flagrant violation of the Utah Constitution is plausible.  Plaintiffs' state constitutional claim against Mr. Anderson will be dismissed.

### III.   PLAINTIFFS' MOTION TO STRIKE DEFENDANT FRASIER'S INSUFFICIENT DEFENSES AND FOR SANCTIONS

Finally, the court addresses Plaintiffs' motion to strike 18[3] of the 22 affirmative defenses pled in Dr. Frasier's Answer [Dkt. No. 86] on the grounds that they fail as a matter of law, fail to allege sufficient facts to state a plausible defense, or are redundant.  Additionally, Plaintiffs are seeking sanctions against Dr. Frasier's attorneys for failing to withdraw these allegedly improper defenses in a timely manner.  Because Dr. Frasier voluntarily withdrew her ninth and twenty-first affirmative defenses, the court will not address them.  For the reasons stated below, the court grants in part, and denies in part, Plaintiffs' motion with respect to the remaining defenses.  The court will not impose sanctions on Dr. Frasier's attorneys for failing to withdraw certain affirmative defenses sooner because the court finds no evidence of bad faith.

### A.   STANDARD OF REVIEW

Under the Federal Rules of Civil Procedure courts may strike from a pleading an "insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."  Fed. R. Civ. P. 12(f).  Such an action may be taken by the court on its own or upon a motion made by a party "either before responding to the pleading or, if a response is not allowed, within 21 days after being served with the pleading."  *Id*.  Even where a party fails to file a motion to strike in a timely manner, courts have discretion to rely on their *sua sponte* power under Rule 12(f) to grant

---

[3] Plaintiffs have moved to strike defenses 5-22 from Dr. Frasier's Answer.

such motions.  *See United States v. Lot 65 Pine Meadow,* 976 F.2d 1155, 1157 (8th Cir. 1992);

*Williams v. Jader Fuel Co., Inc.*, 944 F.2d 1388, 1399 (7th Cir. 1991) ("Courts have read Rule

12(f) to allow a district court to consider a motion to strike at any point in a case, reasoning that

it is considering the issue of its own accord despite the fact that its attention was prompted by an

untimely filed motion."); *Emmpresa Cubana Del Tabaco v. Culbro Corp.*, 213 F.R.D. 151, 155

n. 2 (S.D.N.Y. 2003) ("[T]he Court's discretion renders the twenty-day rule essentially

unimportant.") (quotation marks and citation omitted).

　　　　Nevertheless, motions to strike are disfavored and striking a defense is a drastic remedy.

*See Stanbury Law Firm v. IRS*, 221 F.3d 1059, 1063 (8th Cir. 2000) ("[S]triking a party's

pleadings is an extreme measure, and, as a result, we have previously held that motions to strike

under Fed. R. Civ. P. 12(f) are viewed with disfavor and are infrequently granted.") (quotation

marks and citation omitted); *Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards*, 677

F.2d 1045, 1057 (5th Cir. 1982) ("motions to strike a defense are generally disfavored").

Generally, motions to strike are not granted unless the questionable material is prejudicial to the

moving party.  *See Davis v. Ruby Foods, Inc.*, 269 F.3d 818, 821 (7th Cir. 2001) ("We . . . take

this opportunity to advise . . . against moving to strike extraneous matter unless its presence in

the [pleading] is actually prejudicial . . . .").  *Cf. Waste Mgmt. Holdings, Inc. v. Gilmore*, 252

F.3d 316, 347 (4th Cir. 2001) ("[A] defense that might confuse the issues in the case and would

not, under the facts alleged, constitute a valid defense to the action can and should be deleted.")

(citation omitted).  The Tenth Circuit has warned that courts should "proceed with extreme

caution in striking a pleading."  *Colo. Milling & Elevator Co. v. Howbert*, 57 F.2d 769, 771

(10th Cir. 1932).

Still, it is within this court's discretion to grant a motion to strike.  *See Scherer v. United States Dep't of Educ.*, 78 F. App'x 687, 689 (10th Cir. 2003).  While Plaintiffs' motion to strike Dr. Anderson's affirmative defenses is tardy by a significant margin, the court will consider the merits of the motion and determine whether to exercise its discretion to strike any defenses that may be prejudicial to Plaintiffs.

### B.     STANDARD FOR PLEADING AFFIRMATIVE DEFENSES

The court will first address Plaintiffs' argument that several of Dr. Frasier's affirmative defenses should be dismissed as a result of a failure to allege facts sufficient to demonstrate that the defenses are plausible.  It is Plaintiffs' contention that defendants must meet the pleading standard established in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009).  In *Twombly*, the Supreme Court held that in order to survive a motion to dismiss, a complaint must allege sufficient factual matter that, if accepted as true, would "state a claim to relief that is plausible on its face."  550 U.S. at 570.  A complaint "does not need detailed factual allegations," but must provide grounds for entitlement to relief and requires "more than labels and conclusions."  *Id*. at 555.   The Court reaffirmed the *Twombly* pleading standard in *Iqbal*, and extended its application to all civil actions.  *Iqbal*, 556 U.S. at 684.

Neither *Twombly* nor *Iqbal*, however, address whether the same standard for pleading a complaint applies to pleading affirmative defenses in an answer.  While no federal Courts of Appeals have addressed this question, Plaintiffs argue that this court should follow what some courts have said is the majority approach and apply the heightened *Twombly*/*Iqbal* standard to

affirmative defenses.[4]  The court, however, finds the reasoning of those courts that have declined

to apply a heightened pleading standard to affirmative defenses persuasive.

The *Twombly*/*Iqbal* pleading standard arises out of Federal Rule of Civil Procedure

8(a)(2): "A pleading that states a claim for relief must contain: . . . (2) a short and plain statement

of the claim *showing* that the pleader is entitled to relief . . . .".  Fed. R. Civ. P. 8(a)(2) (2012)

(emphasis added).  Importantly, subsequent language in Rule 8, that governs the pleading of

defenses, differs in a vital way.  Rule 8(b)(1)(A) indicates that "[i]n responding to a pleading, a

party must (A) state in short and plain terms its defenses to each claim asserted against it . . . ."

and Rule 8(c) says, with regard to pleading affirmative defenses, "[i]n responding to a pleading,

a party must affirmatively state any avoidance or affirmative defense . . . .".[5]  *See* Fed. R. Civ. P.

---

[4] Plaintiffs argue, and several courts have suggested, that the majority approach has been to apply the *Twombly*/*Iqbal* pleading standard to affirmative defenses.  *See, e.g. Shaw v. Prudential Ins. Co. of Am.*, No. 10-03355-CV-W-DGK, 2011 WL 1050004 (W.D. Mo. March 21, 2011) (unpublished) ("the majority of district courts that have considered this question have determined that it makes sense to apply the *Iqbal* standards to affirmative defenses.");  *Lane v. Page*, 272 F.R.D. 581 (D.N.M. 2011) ("a majority of district courts that have addressed the question extended the heightened pleading standard to affirmative defenses"); *Bradshaw v. Hilco Receivables, LLC*, 725 F. Supp. 2d 532, 534 (D. Md. 2010); *Hayne v. Green Ford Sales*, 263 F.R.D. 647, 650 (D. Kan. 2009) ("The majority of courts addressing the issue, however, have applied the heightened pleading standard announced in *Twombly*, and further clarified in *Iqbal*, to affirmative defenses."); *CTF Dev., Inc. v. Penta Hospitality, LLC*, No. C 09-02429 WHA, 2009 WL 3517617 (N.D. Cal. Oct. 26, 2009) (unpublished) ("Under the *Iqbal* standard, the burden is on the defendant to proffer sufficient facts and law to support an affirmative defense"); *FDIC v. Bristol Home Mortg. Lending, LLC*, No. 08-80536-CIV, 2009 WL 2488302 (S.D. Fla. Aug. 13, 2009) (unpublished) (applying *Twombly* to affirmative defenses); *Teirstein v. AGA Medical Corp.*, No. 6:08cv14, 2009 WL 704138 (E.D. Tex. March 16, 2009) (unpublished) (affirmative defenses subject to the same pleading standards as complaints and counterclaims). However, a growing number of district courts are declining to extend the *Twombly*/*Iqbal* pleading standard to affirmative defenses, and it is unclear whether that approach is still a majority position.  *See e.g., Unicredit Bank AG v. Bucheli*, No. 10-2436-JWL, 2011 WL 4036466 (D. Kan. Sept. 12, 2011) (unpublished) ("[A]lthough at one time a majority of district courts had concluded that the *Twombly* standards should apply to affirmative defenses, the majority position in the District of Kansas is that those standards do not apply here."); *Willis v. Quad Lakes Enterprises, L.L.C.*, No. 4:11-CV-00096-SWH, 2011 WL 3957339 (W.D. Mo. Sept. 7, 2011) (unpublished) ("The more heightened pleading standard set forth in *Iqbal* and *Twombly* . . . does not apply to the pleading requirements for affirmative defenses.");  *Falley v. Friends Univ.*, 787 F. Supp. 2d 1255 (D. Kan. 2011) (declining to extend the rationale of *Twombly* to the pleading requirements for affirmative defenses); *Lane*, 272 F.R.D. at 591 ("The Court declines to extend the heightened pleading standard the Supreme Court established in *Bell Atlantic v. Twombly* and *Ashcroft v. Iqbal* to affirmative defenses."); *McLemore v. Regions Bank*, Nos. 3:08-cv-0021, 3:08-cv-1003, 2010 WL 1010092 (M.D. Tenn. March 18, 2010) (unpublished).  Regardless, as discussed above, this court finds the reasoning of those courts that have declined to apply a heightened pleading standard to affirmative defenses persuasive.

[5] Courts differ over whether Rule 8(b)(1)(A) applies to affirmative defenses or not.  *Compare First Nat'l Ins. Co. of Am. v. Camps Servs., Ltd.*, No. 08-cv-12805, 2009 WL 22861 (E.D. Mich. Jan. 5, 2009) (unpublished) ("The pleading of affirmative defenses is governed by Rule 8(c).") *with Lane*, 272 F.R.D. at 592-94 (applying the more general language of Rule 8(b) to all defenses, including affirmative defenses).  As neither Rule 8(b)(1)(A) or Rule 8(c) require that a defendant "show" their defense, the disagreement is immaterial in this context.

8 (2012).  Courts that have declined to apply the *Twombly*/*Iqbal* standard to affirmative defenses

rely on the fact that neither Rule 8(b)(1)(A) nor Rule 8(c) require defendants to "show" their

affirmative defenses, in contrast to Rule 8(a)(2)'s requirement that pleaders "show" that they are

entitled to relief.  *See Falley v. Friends Univ.*, 787 F. Supp. 2d 1255, 1257-58 (D. Kan. 2011);

*Lane v. Page*, 272 F.R.D. 581, 591-94 (D.N.M. 2011).  *Cf. Twombly*, 550 U.S. at 556 n. 3

(relying on the word "showing" to support holding that plaintiffs are required to plead facts).

Thus, the language of Rule 8 does not compel courts to apply the same pleading standard to both

complaints and affirmative defenses pled in responsive pleadings.

 Furthermore, courts declining to extend the *Twombly*/*Iqbal* standard to pleading

affirmative defenses note that Form 30, in the forms appended to the Federal Rules of Civil

Procedure, indicates that an affirmative 12(b)(6) defense can be properly pled with a one-

sentence statement: "The complaint fails to state a claim upon which relief can be granted."  *See*

Fed. R. Civ. P. Form 30 (2012).  Rule 84 states that "The forms in the Appendix suffice under

these rules and illustrate the simplicity and brevity that these rules contemplate."  Fed R. Civ. P.

84.  The fact that a simple statement that a complaint "fails to state a claim" is sufficient to plead

an affirmative defense under the federal rules, even in the absence of additional factual

allegations, suggests that the heightened *Twombly*/*Iqbal* standard was not intended to be

extended to affirmative defenses.

 The court is further persuaded by the practical arguments against applying the heightened

*Twombly*/*Iqbal* standard to affirmative defenses.  Under federal rule, a defendant is generally

required to respond to a complaint "within 21 days after being served with the summons and

complaint . . . .".  Fed. R. Civ. P. 12(a)(1)(A)(i).  If a defendant fails to include an affirmative

defense in her answer, she risks waiving it.  *See* Fed. R. Civ. P. 12(h)(1).  In contrast, plaintiffs

may take years to gather facts and investigate legal claims to prepare a proper complaint. *See Falley*, 787 F. Supp. 2d at 1258; *Lane*, 272 F.R.D. at 596. This asymmetrical burden on defendants supports reading Rule 8(b)(1)(A) and Rule 8(c) to impose a lighter pleading standard than the one imposed by *Twombly* and *Iqbal* on plaintiffs filing initial complaints.

Additionally, it is plaintiffs' submission of their initial complaint that invokes the jurisdiction of the federal courts in the first instance. *See Lane*, 272 F.R.D. at 596. The primary function of imposing a pleading standard on a plaintiff in the first instance is to ensure that "largely groundless claims" are not made to "take up the time of a number of other people." *Twombly*, 550 U.S. at 558 (quotation marks and citation omitted). Affirmative defenses, on the other hand, do not invoke the jurisdiction of the court and screening them for efficiency purposes is not vital.

The standard for pleading affirmative defenses, then, is the one described by the Tenth Circuit in *Creative Consumer Concepts, Inc. v. Kreisler*, 563 F.3d 1070, 1076 (10th Cir. 2009):

> [T]he liberal pleading rules established by the Federal Rules of Civil Procedure apply to the pleading of affirmative defenses. Therefore, we must avoid hypertechnicality in pleading requirements and focus, instead, on enforcing the actual purpose of the rule. Rule 8(c)'s ultimate purpose is simply to guarantee that the opposing party has notice of any additional issue that may be raised at trial so that he or she is prepared to properly litigate it.

(quotation marks and citation omitted). This "notice pleading" standard is a liberal one and requires only a "short and plain" statement of each affirmative defense intended to be brought at trial. *See* Fed. R. Civ. P. 8(b)(1)(A). *See also* Fed. R. Civ. P. Form 30; Fed. R. Civ. P. 84.

Plaintiffs have mistakenly relied on the rules stated in *Twombly* and *Iqbal* as the sole grounds for moving to dismiss most of Dr. Frasier's affirmative defenses. Because this heightened pleading standard does not apply to affirmative defenses, Plaintiffs' arguments with

respect to Dr. Frasier's 5th, 6th, 7th, 8th, 10th, 11th, 12th, 16th, 18th, 19th, 20th, and 22nd

defenses fail.  The court finds no reason to exercise its discretion to strike these defenses and,

therefore, denies Plaintiffs' motion with respect to them.

### C.   DEFENSES BROUGHT PURSUANT TO THE UTAH GOVERNMENTAL IMMUNITY ACT

Plaintiffs also contend that the 13th, 14th, and 15th affirmative defenses pled in Dr.

Frasier's answer should be stricken because they fail as a matter of law.  Each of these defenses

rely on the Utah Governmental Immunity Act, codified at Utah Code Ann. 63G-7-101 *et seq.*

(2012).

Rule 12(f) requires that a defense be "insufficient . . . redundant, immaterial, impertinent,

or scandalous matter" in order to justify striking it.  Fed. R. Civ. P. 12(f).  "A defense is

considered insufficient if it cannot succeed, as a matter of law, under any circumstances."

*Wilhelm v. TLC Lawn Care, Inc.*, No. 07-2465-KHV, 2008 WL 474265 (D. Kan. Feb. 19, 2008)

(unpublished).  *See also Williams v. Jader Fuel Co., Inc.*, 944 F.2d 1388, 1400 (7th Cir. 1991)

(Affirmative defenses will be stricken only when "it appears to a certainty that plaintiffs would

succeed despite any state of the facts which could be proved in support of the defense.").

Plaintiffs correctly argue that Dr. Frasier's appeal to the Utah Government Immunities

Act is insufficient.  As discussed previously, the Utah Supreme Court has made clear in *Jensen*

*v. Cunningham* that the Utah Governmental Immunities Act does not apply to state constitutional

claims.  2011 UT 17, ¶51.  As the only state law claims made against Dr. Frasier are state

constitutional claims, the Utah Governmental Immunities Act cannot be the basis for a valid

defense under any state of the facts.  Therefore, Dr. Frasier's 13th, 14th, and 15th affirmative

defenses cannot succeed as a matter of law.

Allowing these claims to survive Plaintiffs' motion to strike will only cause uncertainty and delay as this case proceeds.  Therefore, in the interest of judicial economy, the court will strike Dr. Frasier's 13th, 14th and 15th affirmative defenses as insufficient.

### D.    DEFENSE THAT PLAINTIFFS HAVE NO RIGHT TO DAMAGES

Plaintiffs finally argue that Dr. Frasier's 17th affirmative defense should be stricken because, under Utah law, they may be entitled to damages for harm that arises out of a violation of a self-executing provision of the Utah Constitution.  *See Spackmam* , 2000 UT 87, ¶ 18. Plaintiffs' argument misconstrues the standard for striking a defense under Rule 12(f).  Under Rule 12(f), a defense may be stricken as insufficient if "it cannot succeed, as a matter of law, under *any* circumstances."  *Wilhelm*, 2008 WL 474265 (emphasis added).  Plaintiffs' argument that a state of facts exists that *may* justify an award of damages is not sufficient to show that there are not *any* circumstances under which Plaintiffs might be barred from receiving damages for an alleged constitutional violation.

To the contrary, the court addressed a circumstance that would bar Plaintiffs from receiving damages for an alleged constitutional violation earlier in this opinion.  As noted above, Mr. Anderson was entitled to have the state constitutional claim brought against him by Plaintiffs dismissed because Plaintiffs have failed to allege facts to support the conclusion that his alleged constitutional violation was a "flagrant" one.  As *Spackman* only allows an award of damages for constitutional violations that are "flagrant," the state constitutional claim brought against him could not survive.

The court makes no comment at this point on whether the conduct allegedly engaged in by Dr. Frasier constitutes a "flagrant" violation of the Utah Constitution, but it is possible that it was not.  If it is eventually found that Dr. Frasier did not commit a "flagrant" violation of the

Utah Constitution, then Plaintiffs will be precluded from an award of damages for any

constitutional violation that Dr. Frasier may have committed.  Because there is at least one

circumstance under which Dr. Frasier's 17th affirmative defense can succeed, this court cannot

dismiss it on the grounds of legal insufficiency.  Therefore, the court denies Plaintiffs' motion to

strike Dr. Frasier's 17th affirmative defense.

## **CONCLUSION**

For the reasons stated above, the court hereby GRANTS Defendants IHC and Beerman's

motion to dismiss [Dkt. No. 139], GRANTS Defendant Anderson's motion to dismiss [Dkt. No.

141], and GRANTS IN PART and DENIES IN PART Plaintiffs' motion to strike Defendant

Frasier's insufficient defenses and for sanctions [Dkt. No. 169].  With respect to Plaintiffs'

motion to strike and for sanctions, the court STRIKES Defendant Frasier's 13th, 14th, and 15th

defenses and DENIES Plaintiffs' motion with respect to all other defenses pled by Defendant

Frasier.  The Court DENIES Plaintiffs' motion with respect to sanctioning Defendant Frasier's

counsel.

DATED this 19th day of April, 2012.

BY THE COURT:

Clark Waddoups
United States District Judge