IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| ABBY TISCARENO, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>LORI FRASIER, et al.,<br><br>Defendants. | **MEMORANDUM DECISION AND ORDER DENYING IN PART AND GRANTING IN PART PLAINTIFFS' MOTION ON SANCTIONS**<br><br>Case No. 2:07-cv-00336<br><br>Judge Clark Waddoups |

Plaintiffs raised very concerning allegations about Defendant IHC and Beerman's conduct throughout the discovery phase of this case in their Motion for Sanctions Against Counsel for Defendants IHC and Beerman (Dkt. No. 405), filed in response to the court's statement during the October 1, 2013 hearing on the parties' cross motions for summary judgment that it would entertain a separate motion for sanctions on discovery issues (*see* Order dated Oct. 2, 2013 [Dkt. No. 393].) The court heard oral argument on the Motion for Sanctions on January 30, 2014 and requested supplemental briefing to develop the record further specifically on the question of the alleged spoliation of evidence surrounding the involvement of Defendant Beerman. (*See* Tr. Hrg. 1/30/14 at 62:7-25 [Dkt. No. 456].) A summary of the complex facts of this case may be found in various Orders on dispositive motions since 2008. (*See* Dkt. Nos. 61, 113, 209).

I.  **Defendant Beerman and Spoliation**

At the January 30, 2014 hearing, the court acknowledged that counsel for Defendant William Beerman had filed an amended Declaration outlining counsel's interactions with Mr.

1

Beerman in preparing Defendants' defense and thoughout the discovery process. The amended Declaration complied with the requirement that it be submitted under penalty of perjury, which the Declaration it replaced had not. (Tr. Hrg. 1/30/14 at 4:6-20 [Dkt. No. 456].) Though this was an improvement, the court noted, it "only goes to part of the issue." (*Id.* at 4:20.) The Declaration was also deficient because of its content, "filled with the kind of conclusory assertions that have no evidentiary value." (*Id.* at 4:21-22.) Mr. Dahlquist, counsel for Defendant Beerman, then at oral argument explained the lengths to which counsel had gone to obtain the participation of Defendant Beerman in the preparation of the joint defense with Defendant IHC. (*Id.* at 23:11 – 26:18.) The court responded that "[i]f your declaration had laid those facts out, all of this would have been much easier for the court to have sorted through." (*Id.* at 26:19-22; *see also* Def. IHC & Beerman's Resp. Suppl. Mem. Re Sanctions 5-7 [Dkt. No. 463].) After the hearing, Mr. Dahlquist provided a new Declaration with Defendants IHC and Beerman's Response on Supplemental Briefing that was submitted under penalty of perjury and eliminated the conclusory nature of the assertions in the previous Declaration. (*See* Decl. Charles W. Dahlquist II, Ex. 2 [Dkt. No. 463-2].)

As the court noted in the January 30, 2014 hearing, with a proper Declaration providing a more complete record of evidentiary facts, the issue as to Defendant Beerman's involvement and the alleged spoliation of evidence due to his lack of involvement and counsel's alleged practice of speaking falsely on his behalf in the preparation of discovery responses, the matter is much simpler to resolve. The court is persuaded that neither Defendant Beerman nor his counsel have spoliated evidence in the course of preparing their case based on his minimal involvement, nor can such a claim prevail based on the existing record, for the reasons argued in Defendant IHC and Beerman's Response to Supplemental Memorandum (Dkt. No. 463). Accordingly, the court

DENIES Plaintiffs' Motion for Sanctions as to Defendant Beerman's alleged spoliation of evidence.

## II.     Sanctions for Other Misconduct

### A.      Failure to Timely Produce in Full the "State Contract"

A much more serious issue of actionably deficient discovery practice exists in this case than the claim of spoliation resulting from the minimal involvement of Defendant Beerman. In requesting supplemental briefing on the specific issue of Mr. Beerman's alleged spoliation of evidence, the court was not implying that the other conduct was of no consequence. The other "categories of so-called abuses by IHC and its counsel," to use Defendants' description (Dfs.' Resp. Suppl. Mem. 5 n.2 [Dkt. No. 463]), remain of concern to the court. For instance, the court finds the late provision of the complete "State Contract"—which outlined the responsibilities Dr. Frasier would carry out on behalf of the State of Utah in the framework of her employment for the University of Utah and in light of "the contract between IHC, PCMC and the University of Utah for Frasier's employment at PCMC" (Pls.' Suppl. Mem re Sanctions 5 [Dkt. No. 453])—to have been highly prejudicial, not only to Plaintiffs' preparation of their case in general, but also to their ability to counter dispositive motions to dismiss at various times based on the alleged lack of state action by IHC/PCMC.

The court agrees that, as explained by Plaintiffs, "[t]he State Contract contains Frasier's *Conflict of Interest—Disclosure Statement* which confirms that IHC, doing business as PCMC, had a contract with the University of Utah to employ and pay Defendant Frasier's salary for providing medical assessments in suspected child abuse cases at PCMC, in fulfillment of Defendant IHC's duties to assist state agencies DHS/DCFS in the investigation and prosecution of suspected child abuse cases under the State Contract." (*Id.* at 16.) The *Conflict of Interest—*

*Disclosure Statement* states that "PCMC contracts with the University for the physician to provide clinical services for PCMC" and that "[t]his person is employed by the University in order to fulfill the requirements of this contract with PCMC and DHS." (*Id.* at 16-17, citing "Conflict of Interest Disclosures" 63-65 [Dkt. No. 348-2].) Defendant Frasier also acknowledged in her February 22, 2013 deposition that "I know that [my] salary came to the University from a contract with Primary Children's. I don't know how it was allocated." (*Id.* at 17, citing Frasier Depo., 2/22/2013, at 84:4-11 [Dkt. No. 348-12].) This acknowledgement establishes the link— not only did the State Contract govern Dr. Frasier's work for IHC/PCMC on behalf of the State of Utah through its agencies DHS/DCFS, but Dr. Frasier knew that such an arrangement between the University and IHC/PCMC existed.

The fact of the State Contract's existence, and thus the arrangements between IHC/PCMC and the University of Utah concerning Dr. Frasier's employment, appears to have been obfuscated for years as this litigation developed. But it cannot now be disputed that the State Contract and any ancillary documents relating to Dr. Frasier's employment were at all times in the possession and control of Defendants, whether their counsel was aware of them or not. It is true that Mr. Wallace, counsel for IHC and Beerman, raised a possible inference that counsel for Defendants IHC and Beerman only knew of the existence of the State Contract, and possibly therefore also of these employment arrangements, since September 2011, though this was ambiguous as stated during oral argument. (*See* Tr. Hrg. 1/31/2013 at 5:13-14 [Dkt. No. 332].) Nevertheless, it is undisputable that even in September 2011, when the State Contract was filed as an exhibit to Defendants' third motion to dismiss (*see* Dkt. No. 140-10), the full document was not provided: "IHC did not disclose the ***complete*** State Contract until February 19, 2013, over 16 months after IHC's and Beerman's Initial Disclosures on September 30, 2011.

4

. . . As an example, the incomplete State Contract did not contain the "Sole Source" letter (*compare* Doc. 140-10 with Doc. 348-2 at 67)." (Pls.'s Mot. Sanctions 9 n.12 [Dkt. No. 405], emphasis in original.) The court notes that the complete State Contract was produced *after* the January 31, 2013 hearing in which the court heard oral argument on Plaintiffs Motion for Leave to File Second Amended Complaint (Dkt. No. 235). In granting that Motion, the court noted that "I believe the pleadings are adequate to state a claim and to state that the defendants were state actors" based on the existence of the State Contract, *even as incompletely produced*. (Tr. Hrg. 1/31/2013 at 20:17-19 [Dkt. No. 332].)

Plaintiffs were not able to make use of the information in the complete State Contract until they filed their Reply on their Motion for Partial Summary Judgment on Defendant Frasier's Affirmative Defenses on March 30, 2013 (Dkt. No. 348). Two months shy of six full years had elapsed in this litigation before the complete State Contract appeared. In attaching that document as an exhibit to their filing, Plaintiffs noted on the cover page of the State Contract that it was as "[p]rovided 2/19/2013 by IHC pursuant to Plaintiffs' objection that DOC 140-10 (and therefore 288-2) was missing Part III, some of the Conflict of Interest Statements of Attachment 1, and all of Attachments 2 & 3." (*See* "DHS Contract for Services" 1 [Dkt. No. 348-2]; *see also* Email dated 2/19/2013, Ex. 1 to Pls.' Mot. Sanctions [Dkt. No. 405-1].) The "Sole Source letter", which was part of the omitted material, provided that "[a]gencies most directly involved in child abuse/neglect cases—law enforcement, DCFS and the Attorney General's Office—use Primary as their main resource for assessments." (*Id.* at 67; *see also* Pls.'s Mot. Sanctions 10 [Dkt. No. 405].)

Despite the existence of the State Contract—charged to the knowledge and control of Defendant IHC—and its employment arrangements which were also apparently known by

Defendant Frasier, the court notes very disturbing lawyering surrounding Plaintiffs' numerous attempts to "discover" the documentation of Dr. Frasier's employment arrangements between the University of Utah and IHC/PCMC, a document that Plaintiff's counsel rightly seems to have inferred existed from the outset. Reviewing the record, the court is tempted to characterize Defendants' responses on this question as egregious. The court has difficulty interpreting the following responses to interrogatories and requests for production aimed at the State Contract and the arrangements between IHC/PCMC and the University of Utah relating to Dr. Frasier's employment as anything but disingenuous—and perhaps dishonest—answers:

> INTERROGATORY NO. 33(C). IDENTIFY any subcontractor, individual or entity with whom you entered into an agreement during the relevant time period "to perform the services . . . for which [PCMC] is responsible under the terms of this Contract" as referenced on p. 22 of the Contract, and describe the services that such subcontractor or entity was to perform.
>
> RESPONSE: Defendants object that this interrogatory is vague and ambiguous. *Defendants cannot recall or locate a record to identify all persons with whom it may have entered into a contract to perform those services identified on p. 22 of the Contract. Defendants believe that contracts were entered into with each of the independent medical practitioners*. [(*See* Defs.' IHC and Beerman Resp. Pls.' First Set of Discovery dated December 1, 2011, at 27-28 [Dkt. No. 364-4], emphasis added.)]
>
> RFP NO. 32: Please PRODUCE all contracts and agreements between Defendant Lori D. Frasier and H-IC, Health Information Services, Inc., dba PCMC, or their respective representatives, however denominated, effective during the years 2002 through 2005.
>
> RESPONSE: *None.* [(*See* Defs.' IHC and Beerman Resp. Pls.' Second Set of Discovery dated January 20, 2012, at 24 [Dkt. No. 364-5], emphasis added.)]
>
> RFP NO. 33: Please PRODUCE all documents showing any contracts, agreements or understandings between IHC, Health Information Services, Inc., dba PCMC, or any related entity and the University of Utah, concerning the funding, staffing and/or operation of the Center for Safe and Healthy Families, for the years 2002 through 2005.

RESPONSE: *These defendants are aware of none.* [(*See* Defs.' IHC and Beerman Resp. Pls.' Second Set of Discovery dated January 20, 2012, at 24 [Dkt. No. 364-5], emphasis added.)]

INTERROGATORY NO. 20: Identify the individuals or entities that paid Defendant Lori Frasier's salary for the administrative duties she performed as Director of Medical Assessments for the Center for Safe and Healthy Families during the years 2002 through 2005.

RESPONSE: Lori Frasier is paid by the University of Utah Medical Center. [(*See* Defs.' IHC and Beerman Resp. Pls.' Second Set of Discovery dated January 20, 2012, at 9 [Dkt. No. 364-5].)]

INTERROGATORY NO. 21: Did Defendant Lori D. Frasier enter into an agreement, contract or other oral or written instrument with HSI, or any related HIS entity or agent, to perform any services for which HSI is responsible under the terms of the Contract produced by you as Exhibit I to your motion to dismiss, Docket No.140-10, including, but not limited to, the services she provided as the Director of Medical Assessments at the Center for Safe and Healthy Families, which was in effect during the years 2003-2005?

RESPONSE: *To the best of our understanding, no.* [(*See* Defs.' IHC and Beerman Resp. Pls.' Second Set of Discovery dated January 20, 2012, at 9 [Dkt. No. 364-5], emphasis added.)]

(Pls.' Suppl. Mem. re Sanctions 17-18 [Dkt. No. 453].)[1] Each of these responses seems like a misrepresentation in light of the information available in the complete State Contract and Dr. Frasier's deposition. In fact, the answers to Request for Production 32 and 33 and Interrogatory 21 seem outright false in light of this information. As noted, the *Conflict of Interest—Disclosure Statement* attached to the State Contract shows that Dr. Frasier was employed under an arrangement between the University of Utah and IHC/PCMC that was ultimately also governed

---

[1] The court notes that Defendants' appear to be perpetuating this misrepresentation in their appellate brief: "Dr. Frasier provided these services to N.M. solely because she, as an independent contractor, was the physician on call at PCMC when N.M. was admitted to the hospital." (Pls.' Suppl. Mem. re Sanctions 19 [Dkt. No. 453], quoting IHC's Opening Brief on Appeal, *Tiscareno et al. v. IHC Health Services, Inc.*, No. 13-4161, 10th Cir., at 21 [Dkt. No. 453-1].) Defendants have consistently argued throughout that IHC is a private entity and therefore there was no state action upon which to predicate state causes of action, a *Brady* duty, or the § 1983 claim (*see, e.g.* Dkt. No. 140, at 2). The court fails to see how this is not a misleading representation in light of the State Contract and the employment arrangements between the University of Utah and IHC/PCMC for Dr. Frasier's services.

7

by the State Contract. "Plaintiffs were preparing to file a motion to compel Defendant IHC to disclose this contract at the time Defendants IHC and Frasier preempted this discovery by appealing the denial of their motions for summary judgment." (*Id.* at 20.) The court agrees that the contract or other agreement(s) or documentation relating to the arrangements between IHC/PCMC and the University of Utah concerning Dr. Frasier's employment must be produced. Accordingly, the court ORDERS Defendants to produce these documents. The court finds that these actions have greatly prejudiced Plaintiffs in the preparation of their case and that sanctions are appropriate for this discovery misconduct, as discussed further below.

In addition to these sanctionable actions in discovery, Defendants have pursued this litigation in an ethically questionable—and the court believes, sanctionable—way even before discovery. That is, not only did Defendants withhold the complete State Contract in discovery, which showed Dr. Frasier was "employed by the University in order to fulfill the requirements of this contract with PCMC and DHS" (*Conflict of Interest—Disclosure Statement* 65 [Dkt. No. 348-2]), but they also argued in motions to dismiss, before discovery, that IHC was a private entity and therefore there could be no "state action" that would subject it to a *Brady* duty or liability under § 1983, despite the fact that the State Contract and its reference to arrangements between IHC/PCMC and the University of Utah concerning Dr. Frasier's employment was in their possession and control.[2] As a result, as early as September 29, 2008, Judge Stewart dismissed claims against Defendants IHC and Beerman because he believed, based upon the allegations in the complaint and the arguments of Defendants, that Defendants IHC and Beerman

---

[2] In fact, Defendants continue to argue this. As noted in *supra* note 1, Defendant IHC continues to argue this on appeal at the present time. Also despite the State Contract and its reference to arrangements between IHC/PCMC and the University of Utah concerning Dr. Frasier's employment, Defendant Frasier continues to argue that "[t]he only reason the Tiscarenos can bring § 1983 claims against Dr. Frasier is because she is an employee of the University of Utah and, therefore, a state actor. Because IHC is a private entity, if Dr. Frasier was its employee, she would not be a state actor and the Tiscareno's § 1983 claims against her would fail." (Def. Frasier's Mem. Opp. Mot. Sanctions 11 [Dkt. No. 462].)

8

were private actors and that no state action had been shown that could form the basis of § 1983 liability, after application of the circuitous tests available under Tenth Circuit precedent to evaluate whether merely private actors may be deemed state actors for purposes of establishing § 1983 liability. (*See* Memorandum Decision and Order dated Sept. 29, 2008, at 9-16 [Dkt. No. 61].)

Judge Stewart's consideration of Dr. Frasier's employment arrangements was central to his dismissal of Plaintiffs' claims against IHC and Beerman at that time:

> Further, at this stage the Court looks only to the allegations in the Complaint. Thus, it is important to distinguish between Plaintiff's arguments and her actual allegations. Contrary to Plaintiff's position, her Complaint does not allege that "IHC employed Defendants Frasier and Walker at PCMC." Instead the Complaint alleges that it was the University of Utah,"a division of the State of Utah, that employed Defendant Frasier during the relevant time" and that she was employed "at" the Center at PCMC. It also alleges she was acting in the course and scope of her employment when she participated in the Tiscareno case, and conducted child abuse and neglect assessments. . . . The acts of these University of Utah employees *are not, however, linked to IHC or to Beerman by anything but the facts that they worked for the University at PCMC* . . . . Accepting Plaintiff's allegations as true, those allegations are insufficient to treat IHC and Beerman as state actors as required by § 1983 under any of the four tests. Therefore, the Complaint fails to state a § 1983 claim against IHC and Beerman.

(*Id.* at 13-15, emphasis added.) The State Contract provides the missing link referred to by Judge Stewart, and it was in the control and possession of Defendant IHC at the time it argued that it was a merely private actor and that no state action could be shown.

Plaintiffs were nevertheless allowed to amend their Complaint. Defendants IHC and Beerman again moved to dismiss based on the argument that they were merely witnesses "who submitted documents pursuant to subpoenas" (and implicitly therefore not state actors under contractual arrangements between the State of Utah through its agencies, the University of Utah, IHC/PCMC, and Dr. Frasier that were in their possession and control) and therefore protected by absolute witness immunity. (Defs.' IHC and Beerman's Mem. Supp. Mot. Dismiss First Am.

Compl. 8 [Dkt. No. 85].) This court denied that Motion to Dismiss because the First Amended Complaint, it found at that time, "contains various allegations that arguably establish that IHC and Beerman should be deemed state actors." (Memorandum Decision and Order dated Dec. 4, 2009, at 4 [Dkt. No. 113].) Defendants IHC and Beerman then filed their Answer to the First Amended Complaint. "This Answer was filed 15 months after the filing of Plaintiffs' First Amended Complaint and it would be another 18 months until IHC and Beerman disclosed the State Contract" in incomplete form in September 2011. (Pls.' Mot. Sanctions 13 [Dkt. No. 405].)

In their Answer, Defendants IHC and Beerman did not refer or allude to the State Contract and its reference to arrangements between IHC/PCMC and the University of Utah concerning Dr. Frasier's employment, despite having this document to their charge and knowledge. The Answer denied paragraph 4 of the First Amended Complaint, which alleged "[t]he University of Utah, a division of the State of Utah, and Defendant IHC, doing business as PCMC, jointly employed Frasier at PCMC, and IHC publicly advertised Frasier as a PCMC physician and staff member during the relevant time." (First Am. Compl. 4, ¶ 4 [Dkt. No. 79].) Defendants IHC and Beerman denied this allegation despite their possession of the State Contract and its reference to arrangements between IHC/PCMC and the University of Utah concerning Dr. Frasier's employment. (Answer of Defs. IHC and Beerman 3, ¶ 5 [Dkt. No. 121].) The court agrees that Defendants must have known "this denial was false and misleading, because Defendant Frasier *was* and is a dual employee of IHC and the U of U, as shown in her *Conflict of Interest Disclosure* (Doc. 348-3), which Plaintiffs ultimately obtained in discovery." (Pls.' Mot. Sanctions 15 [Dkt. No. 405], emphasis in original.)[3] In renewing their Motion to

---

[3] This 'complete' State Contract was finally obtained by Plaintiffs' counsel two weeks after Plaintiffs filed their Second Amended Complaint (Doc. 288), and 15 months after IHC and Beerman filed the incomplete version (Doc. 140-10) in support of their [renewed Motion to Dismiss the First Amended Complaint and/or for Summary Judgment] (Doc. 140)." (Pls.' Mot. Sanctions 15-16 [Dkt. No. 405].)

Dismiss the First Amended Complaint, or for Summary Judgment on September 9, 2011, despite having the State Contract in their possession, Defendants IHC and Beerman argued that "William Beerman and IHC are not state actors for purposes of civil rights violations. IHC is a private hospital entity and Mr. Beerman was merely the head of a records department in IHC." (Defs.' Mem. Supp. Mot. Dismiss or Summ. J. 2 [Dkt. No. 140].) Defendants attached an incomplete copy of the State Contract to this Memorandum, omitting "among other things, as part of Attachment A, the Conflict of Interest-Disclosure Statement for Defendant Lori Frasier" (Pls.' Mot. Sanctions 17 [Dkt. No. 405]), which, as noted above, shows that "PCMC contracts with the University for the physician to provide clinical services for PCMC" and that, as the physician referred to, Dr. Frasier was "employed by the University in order to fulfill the requirements of this contract with PCMC and DHS" (*Conflict of Interest—Disclosure Statement* 65 [Dkt. No. 348-2]). The "Sole Source" letter contained in Attachment B to the State Contract was also omitted, which appears to designate that "under the State Contract, DHS/DCFS contracts with IHC as the 'sole source' provider of medical assessments for suspected victims of child abuse, and that the vast majority of children who are brought to PCMC for assessment of child abuse also receive treatment at PCMC for which IHC is liable to bill government and private insurance providers millions of dollars per year." (Pls.' Mot. Sanctions 18 [Dkt. No. 405], citing State Contract, Part 1(A)(7), "Compliance with Procurement Requirements" and "Sole Source" letter, Attachment B, at 4 & 67 [Dkt. No. 348-2].)

After the exchange of discovery requests and responses to those requests between September 2011 and January 2012, Defendants IHC and Beerman amended their Answer to the First Amended Complaint on January 6, 2012. (*See* Am. Answer of Defs. IHC and Beerman [Dkt. No. 184].) They had attached the incomplete State Contract to their Memorandum in

Support of their renewed Motion to Dismiss the First Amended Complaint or for Summary Judgment on September 9, 2011 (Dkt. No. 140-10). Nevertheless, the Amended Answer continues to deny paragraph 4 of the First Amended Complaint (quoted above).

On April 19, 2012, this court granted Defendants IHC and Beerman's renewed Motion to Dismiss the First Amended Complaint (Dkt. No. 140). (*See* Memorandum Decision and Order dated April 19, 2012 [Dkt. No. 209].) At the time, the court disregarded extraneous material submitted by Defendants with their Motion to Dismiss—including the incomplete State Contract (Dkt. No. 140-10)—because it found that "Defendants' motion can be resolved on the pleadings alone" and the court believed that the motion need not be treated as a Motion for Summary Judgment by considering the extraneous material. (Memorandum Decision and Order dated April 19, 2012, at 8-9 [Dkt. No. 209].) The court now believes it was in error to do so. The court premised its dismissal squarely on the apparent lack of state action by IHC and Beerman following the application of the Tenth Circuit's four tests to determine whether private actors may be deemed to engage in state action in certain circumstances. (*See id.* at 9-14.) Plaintiffs did not yet have the State Contract and an incomplete version of it was provided by Defendants with their motion; however, the court disregarded extraneous materials so as not to convert the pleading from a motion to dismiss to a motion for summary judgment.

Had the court considered the extraneous material including the incomplete State Contract, the court does not believe that it would have found no state action on the part of Defendant IHC and Frasier after application of the Tenth Circuit's four tests. In fact, as noted above, the court stated as much when it granted Plaintiffs' Motion for Leave to File Second Amended Complaint (Dkt. No. 235) in the January 31, 2013 hearing. Based on having reviewed even the incomplete State Contract—which at that time was still the only document that had been produced in this

litigation because the complete State Contract including the *Conflict of Interest-Disclosure Statement* and the "Sole Source" letter, among other omitted information, was first made available on February 19, 2013 (*see* Dkt. No. 405-1)—the court noted that "I am satisfied on the pleadings set forth in the complaint, again without making any decision as to what the ultimate evidence will be, but at this stage of the proceeding I'm satisfied that the pleadings meet the requirement this was a function exclusively reserved to the state, and I believe that that would be sufficient to state a claim that the defendants were proceeding as state actors." (Tr. Hrg. 1/31/2013 at 19:23-25 [Dkt. No. 332].) The court found that "I am going to grant the motion to allow the Second Amend Complaint for the reasons that I've stated. I believe the pleadings are adequate to state a claim and to state that the defendants were state actors." (*Id.* at 20:16-19 [Dkt. No. 332].)

    Thus, the court must agree with Plaintiffs argument that

> IHC withheld the State Contract for over four years, between the filing of the complaint in this matter and their disclosure of the State Contract as an exhibit (Doc. 140-10) to their (third) Motion to Dismiss and/or for Summary Judgment (Doc. 140). During that time, IHC filed at least three dispositive motions and made numerous arguments that IHC, Beerman and Frasier were "mere witnesses" and had no other role in the investigation or prosecution of Plaintiff Abby Tiscareno. *IHC and its counsel knew that these representations were false based on documents in their possession, including the State Contract*. In addition, IHC and its counsel withheld the complete version of the State Contract, containing, inter alia, Frasier's Conflict of Interest Disclosure for 17 months, until February 19, 2013.
>
> These dilatory dispositive motions, accompanied by Defendant IHC's and its counsel's strategic failure to advise the Court and Plaintiffs of the State Contract, severely prejudiced Plaintiffs in defending Defendants' dispositive motions and in proving Plaintiffs' claims. These tactics also prejudiced Plaintiffs because they could not even begin to conduct discovery on their claims during the pendency of these motions which extended over four years. Also, *had Defendant IHC and its counsel revealed the State Contract to the Court in connection with the first two motions*, Plaintiffs' claims against IHC and Beerman *would not have been dismissed for lack of "state action" and Plaintiffs would not have had to file their First Amended Complaint to make further allegations regarding Defendants'*

> *"state action", and would have had the State Contract to prove the "state action" element of their due process claim against Defendants.*

(Pls. Suppl. Mem. re Sanctions 20-21 [Dkt. No. 453], emphasis added.) The court's statement in the January 31, 2013 hearing granting the Plaintiffs' Motion for Leave to File the Second Amended Complaint establishes that in light of the incomplete State Contract, state action would exist under the Tenth Circuit's tests. The court believes this is much more firmly established after revelation of the complete State Contract. The complete State Contract was in Defendants' possession and control throughout the entire course of this litigation. It was filed in incomplete form in support of the third Motion to Dismiss filed by Defendants (Dkt. No. 140-10). It is unclear why it was not filed in support of the earlier motions to dismiss. However, it is certain that Defendants' course of conduct has severely prejudiced Plaintiffs' case and has interfered with the administration of justice in the federal courts.

Based on this finding of prejudice, the court GRANTS Plaintiffs' Motion for Sanctions against Defendants IHC and Beerman as to their conduct relating to the State Contract. The court will entertain a further motion from Plaintiffs explaining, in their view, just "how much" this conduct prejudiced them in monetary terms. The court will award pecuniary sanctions against Defendants based on the extra legal work that resulted to Plaintiffs' counsel from this conduct. Defendants will have an opportunity to respond and Plaintiffs to reply on the normal briefing schedule. The court is also considering entering a finding, as part of the sanctions, precluding Defendants from arguing any longer that there was no state action. Parties should include this possibility in the briefing as well.

### B.   Issues with the Brickey Subpoenas and Destruction of Documents

The court is similarly perplexed by Defendants' handling of the subpoenas issued by Summit County Prosecutor David Brickey in the original prosecution of the case against Plaintiff

Abby Tiscareno for allegedly abusing N.M., the underlying basis of the current litigation. Prosecutor Bricky testified in his deposition that he served two written subpoenas on the Medical Records Department at PCMC for N.M.'s complete medical records. (Pls.' Suppl. Mem. re Sanctions 26-27 [Dkt. No. 453], quoting Brickey Depo, 2/14/2013, Vol. 2, at 209:10-19 [Dkt. No. 348-11].) Nevertheless, in several responses to discovery requests, Defendants IHC and Beerman have evaded the issue, refusing to acknowledge the existence of Prosecutor Brickey's two subpoenas for N.M.'s complete medical records or asserting that merely a "verbal request was made either to someone in PCMC Medical Records Department or to someone at Iron Mountain, the contractor who copied medical records for Primary Children's Medical Center at the time . . . ." (*Id.* at 25, quoting IHC/Beerman Response to Plaintiffs' Second Discovery Requests, Interrogatory 3, at 2-3 [Dkt. No. 364-5].) In fact, Defendants IHC and Beerman argued in support their Motion for Summary Judgment that there is no evidence that subpoenas were involved in this case and that "[n]o subpoena was ever issued to these Defendants for medical records. . . . Thus the allegedly exculpatory records were never requested from these defendants." (Defs.' IHC and Beerman's Mot. Summ. J. 4 & 10 [Dkt. No. 343].) Moreover, the court finds it extraordinary that Defendants now appear to be arguing on appeal that "there is no evidence that Defendant IHC had received any subpoenas from Prosecutor Brickey." (*Id.* at 26, citing Defendant IHC's Opening Brief on Appeal, *Tiscareno et al. v. IHC Health Services, Inc.*, No. 13-4161, 10th Cir., at 20 & 53 [Dkt. No. 453-1].)

The court is very concerned about Defendant IHC's inability to acknowledge and/or produce the two subpoenas that Prosecutor Brickey testified under oath that he served on PCMC in the course of the investigation leading to Plaintiff Abby Tiscareno's prosecution for allegedly abusing N.M. Additionally, "[a]lthough Defendant IHC has a policy requiring all disclosures to

15

law enforcement to be logged in an 'Accounting of Disclosures,' IHC has not produced policy 3.2.5 which governs the Accounting of Disclosures Database nor the information from the database to show that the Brickey subpoenas were not received." (*Id.* at 28.) The court agrees that this is of great concern to the discovery process in this case. "Plaintiffs anticipated filing a motion to compel production of these documents at the time Defendants preempted this discovery by the filing of their appeals from this Court's denial of their motion for summary judgment." (*Id.*) In light of this, Plaintiffs shall include their request to compel with their further briefing on sanctions and Defendants should brief their view as to why the court should not find that Defendants' spoliation, loss, or refusal to produce the Brickey subpoenas or the materials from the "Accounting of Disclosures Database" referred to above is sanctionable in the amount to be argued and documented by Plaintiffs in the briefing.

Finally, Plaintiffs note several instances through the discovery process in which Defendants have acknowledged the destruction of documents relevant to this case. (*See, e.g.*, Pls.' Mot. Sanctions 21 ¶ 36, 24 ¶ 42 [Dkt. No. 405].) The parties shall provide further information and argument as to the circumstances surrounding the destruction of this material that the court will consider in issuing its final order on sanctions at the completion of the briefing. The parties will have the opportunity of a final oral argument on the sanctions issues at the completion of briefing.

The court wishes to resolve the sanctions issue, including the monetary amounts involved as sanctions and any other sanctions such as precluding Defendants from arguing a lack of state action, on the final briefs and oral argument.

## CONCLUSION

The court DENIES Plaintiffs' Motion for Sanctions (Dkt. No. 405) as to the alleged spoliation relating to Defendant Beerman's minimal involvement, loss of memory, and general unhelpfulness in his deposition. Accordingly, the court TERMINATES AS MOOT Defendants IHC and Beerman's Motion for in camera review (Dkt. No. 449).

However, the court GRANTS Plaintiffs' Motion for Sanctions (Dkt. No. 405) as to Defendants' handling of the complete State Contract with its reference to arrangements between IHC/PCMC and the University of Utah concerning Dr. Frasier's employment. The parties are to brief the amount of monetary sanctions appropriate to remedy the prejudice caused to Plaintiffs' case as a result of Defendants' discovery practice relating to the provision of the complete State Contract. This includes the prejudice resulting to Plaintiffs' case from Defendants arguments in several motions to dismiss, despite possession and control of the State Contract, that IHC was merely a private entity such that no state action was involved in the investigation and assessment of N.M.'s child abuse case by Dr. Frasier and IHC at Primary Children's Medical Center. The court also ORDERS Defendants to produce the contract or other agreement(s) or documentation relating to the arrangements between IHC/PCMC and the University of Utah concerning Dr. Frasier's employment. Defendants should also explain to the court why they should not be precluded from arguing that there was no state action for the remainder of this litigation as a further sanction.

In their further briefing of these sanctions issues, Plaintiffs shall also include their request to compel IHC's "policy 3.2.5 which governs the Accounting of Disclosures Database" and the information from the database sufficient to establish whether or not the Brickey subpoenas were received, and Defendants should explain why the court should not find Defendants' spoliation,

loss, or refusal to produce the Brickey subpoenas or the materials from the "Accounting of Disclosures Database" referred to above sanctionable in the amount to be argued and documented by Plaintiffs in the briefing. The parties shall further brief the several acknowledged instances in which Defendants have destroyed documents relevant to this case and whether those actions merit sanctions as well.

SO ORDERED this 19th day of November, 2014.

BY THE COURT:

_____
Clark Waddoups
United States District Judge